THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JOEL OLIVERA, Defendant-Appellant.

First District (5th Division)   No. 1 –90—3054

Opinion filed April 30, 1993.

Michael J. Pelletier and Patricia Unsinn, both of State Appellate Defender's Office, and Schiff, Hardin & Waite, both of Chicago (James A. Clark and Jay Williams, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Christine Perille, Special Assistant State's Attorney, and Renee Goldfarb and James Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

The defendant, Joel Olivera (Olivera), and codefendant, Jorge Vargas (Vargas), were charged by indictment with the offenses of first

degree murder and armed violence for their respective roles in the fatal shooting of Raphael Torres on July 29, 1988.[1] Following a jury trial, Olivera was convicted of first degree murder and sentenced to 35 years in the Illinois Department of Corrections.

On appeal defendant presents the following issues for review: (1) whether the defendant was proven guilty beyond a reasonable doubt; (2) whether the trial court committed reversible error in denying defendant's motion to suppress statements; (3) whether the trial court committed reversible error in denying second degree murder instructions; (4) whether the trial court committed reversible error by failing to require the State to produce to the defense certain notes used by the assistant State's Attorney to refresh his recollection before testifying; (5) whether the prosecutor's alleged references in closing argument to Olivera's failure to testify constituted reversible error; and (6) whether the trial court abused its discretion in sentencing the defendant to 35 years.

## TRIAL

Raphael Torres was shot and killed on the evening of July 29, 1988, near the intersection of 19th Street and Wood Street in Chicago. Testimony indicated that Torres died that night of a single gunshot wound to the chest. The fact that Torres was shot and killed on July 29, 1988, was undisputed at trial.

The State called nine witnesses at trial in its case against Olivera. Alvaro Dominguez was called to testify by the State and was the only individual to testify as an eyewitness to the shooting. Mr. Dominguez testified that on the evening of July 29, 1988, he and three friends were standing outside talking at a friend's house located near the intersection of 19th Street and Wood Street. As they were talking, Mr. Dominguez observed a youth (Torres) crossing the intersection of 19th and Wood alone. As Torres was crossing the intersection, a prime gray car entered the intersection slowly. He saw someone in the driver's seat of the car and someone in the backseat, behind the driver. Something was said and he heard a single shot fired. The shot came from the intersection. At trial he could not say whether the shot was fired from the backseat; however, on the evening of the incident, he reported to the police that there were at least three people in the gray car and that the shot he had heard came from the backseat of

---

[1]Prior to trial, the trial court granted the defendant's motion to sever. Simultaneous but separate jury trials were thereafter held for each defendant.

the vehicle behind the driver's seat. After he heard the shot, Mr. Dominguez saw the victim stumble out of view and the gray car drove off; the victim was on the driver's side of the car at the time Dominguez heard the shot. He did not see anyone get out of the car, walk over to the youth, and shoot him. He did not see anyone making gang signs, nor did he see persons throwing bottles at the car.

Mr. Dominguez further testified that he did not know the victim and had never seen or known Olivera before the day of the trial. Mr. Dominguez was unable to identify the three individuals he saw in the gray car, he was only able to see their silhouettes. Mr. Dominguez was never asked by the police to view a lineup with Olivera in it and never identified Olivera as being involved in the Torres shooting.

According to police witnesses called by the State, shortly after the shooting occurred, the crime scene was secured and the entire area was thoroughly searched and photographed by several police officers and detectives. The physical evidence found at the scene consisted of a single discharged .25-caliber cartridge case. No gun was ever recovered in connection with the Torres shooting. No broken glass was found near the intersection, and no evidence of any bullets, bullet holes or bullet marks of any kind was found by the police in the buildings near where the victim was shot.

A firearms examiner testified that the bullet recovered from Torres was a .25-caliber bullet. However, he also testified that although the discharged .25-caliber shell casing found at the scene of the Torres shooting and the .25-caliber bullet recovered from Torres' chest were both .25 caliber, it was impossible to determine, without having and testing the gun that was used, whether the bullet from Torres' chest, was, in fact, fired from the shell recovered at the crime scene.

Officer Darrell Gilliam was assigned to investigate an aggravated battery which had occurred on July 31, 1988 (the Cortez shooting). The officer had been to defendant's home several times and had left his card, since defendant was a suspect for that crime. On August 9, 1988, Officer Gilliam received a phone call from an attorney who stated that he had the defendant with him and he wanted to bring him to the station. When defendant arrived at the station, the officer told him that he would be charged with an aggravated battery and advised him of his rights. Officer Gilliam prepared the paperwork associated with the arrest, contacted a youth officer due to defendant's age, and brought defendant to violent crimes Detective Chris Kato. At the conclusion of Officer Gilliam's testimony, the trial judge instructed the jury that the testimony concerning the aggravated battery was only

elicited to show that defendant was in the police station and did not have any relevancy to the trial.

Detective Kato also testified on behalf of the State. On August 9, 1988, he was also assigned to investigate the aggravated battery case and had been informed by Officer Gilliam that defendant was in custody. A lineup was conducted and defendant was informed of the results. Defendant was advised of his rights and he spoke to the officers about the aggravated battery. When Detective Kato spoke to his lieutenant about the Cortez case, he was informed that it had similarities to a homicide that had occurred two days earlier. Detective Kato went back into the interview room, readvised defendant of his rights, and defendant confessed to the shooting of Raphael Torres.

At approximately 3:30 a.m., Assistant State's Attorney (ASA) Cummings met with the defendant in the presence of Detective Kato and youth officer Troike. ASA Cummings testified that the defendant was again advised of his rights and subsequently had a conversation with him. Defendant chose to memorialize his statement with a court reporter, so a court reporter was requested. About one hour later ASA Cummings stepped into the interview room to see if defendant needed to use the washroom or if he wanted a drink. The defendant told the ASA that he had been treated well.

The court reporter arrived and the defendant indicated he understood his rights prior to making his statement. ASA Cummings published the defendant's statement to the jury. The statement disclosed the following. ASA Cummings supplied the date, time, location and name of the victim by stating: "We're here to take the statement of Joe [sic] Olivera concerning the investigation of the shooting of Ralph [sic] Torres, which occurred on July 29, 1988, at approximately 10:40 p.m. at 1900 South Wood, Chicago, Illinois." Defendant told the ASA that he was driving around with his friend "White Boy" (Jorge Vargas) at 10:30 p.m. Defendant was sitting in the passenger seat. As they were driving, defendant saw seven members of the Bishops, a rival gang of defendant's gang, the Morgan Boys. The Bishops were making hand signals and throwing bottles at their car. Defendant was scared so he went for the gun under White Boy's seat. Defendant shot at the crowd of Bishops two to seven times and then left the scene. Defendant, ASA Cummings, Detective Kato and youth Officer Troike initialed and signed the confession. At the conclusion of defendant's statement, ASA Cummings testified that in his first conversation with the defendant, Olivera had not indicated that bottles had been thrown or that he was scared.

Although Olivera did not himself testify at trial, two witnesses, Christine Alvarado and Erma Cazares, testified on his behalf. Christine Alvarado testified that on July 29, 1988, she was sitting out in front of her house. She saw defendant at the corner between 10 and 11 p.m. and did not see him leave in a car. Defendant went inside, at about 11:15 p.m., before his father came home from work. Anthony Alvarez came over to talk to her and told her that someone had been shot at 19th and Wood. Ms. Alvarado did not know how Anthony could have learned about the shooting since she did not see anyone come to talk with him and he never left the corner. On redirect, however, she stated that she saw a car stop at the corner. Although Ms. Alvarado learned that defendant had been arrested for murder, she never told the police or the State's Attorney's office that she saw defendant on the night of the incident.

Erma Cazares, who lived in the same building as defendant, also testified that she saw defendant on July 29, 1988, talking with some guys across the street. She saw defendant talk to someone in a car, but she never saw him leave the area. Ms. Cazares was outside on the steps with her kids until about 11 p.m. Although Ms. Cazares also learned that defendant had been arrested, she did not give this information to the police or the State's Attorney's office.

### THE MOTION TO SUPPRESS

Prior to trial, a hearing was held on defendant Olivera's motion to suppress his statement. The testimony at the motion disclosed the following.

Chicago police officer Darrell Gilliam testified on behalf of the State. At approximately 6 to 7 p.m. on August 9, 1988, Officer Gilliam met Olivera, Olivera's father, and Olivera's attorney at the police station. Officer Gilliam had previously been trying to locate Olivera as a suspect in the Cortez case. Earlier that day he had received a call from an attorney he believed to be John DeLeon (DeLeon), who indicated he was willing to surrender his client, Olivera, to police custody. At the station, Officer Gilliam informed DeLeon that he would be advising the defendant of his juvenile rights and, after his processing, Olivera would be turned over to area four violent crimes detectives for the follow-up investigation. He informed DeLeon and Olivera that a lineup was to be conducted. DeLeon told him that his client would not make any statement as to this particular incident other than giving the officer the pertinent information for the arrest reports. Officer Gilliam testified that he and DeLeon had a gentleman's agreement that if Olivera was picked out of the lineup, Gilliam would contact the

attorney and let him know what happened. Prior to DeLeon leaving the station, he left his business card which had his beeper number and home phone number. DeLeon did not ever tell him that he wanted to be present for any lineup.

After DeLeon left, Gilliam processed the arrest report and turned Olivera over to Detective Chris Kato. When Officer Gilliam spoke with Detective Kato, he told him that he had placed Olivera under arrest and that Olivera had surrendered himself with his attorney. Officer Gilliam testified: "I told Officer Kato that he surrendered himself with his Attorney and his Attorney had instructed his client not to give me any information as to this particular incident." After that point he had no further contact with Joel Olivera.

Officer Gilliam further testified that at approximately 10 p.m., he received a call from Detective Kato, who informed him that two witnesses made a positive identification of Olivera as to the aggravated battery of Raphino Cortez. At that time, Officer Gilliam contacted DeLeon and informed him Olivera had been identified and would be turned over to area four. Officer Gilliam was not aware that Olivera was a suspect in a homicide until the next day when he returned to work. He testified that neither he nor anyone in his presence ever struck the defendant or told him that he could not talk to his attorney. Officer Gilliam did not give Detective Kato either of the numbers DeLeon left.

Detective Wayne Johnson also testified on behalf of the State. On August 9, 1988, he was a Chicago police detective assigned to area four violent crimes. On that night his partner was Detective Kato. Although he did not receive any information from Officer Gilliam that evening, his partner did. Detective Kato informed him that a gang crimes specialist was bringing up a person turned in on a shooting. He and Detective Kato conducted a lineup regarding the July 31, 1988, Cortez shooting. The defendant was identified in the lineup. Shortly thereafter, Detective Johnson had a conversation with Detective Kato. At approximately 11 p.m., he went to an interview room where Detective Kato and Olivera were also present. The defendant proceeded to give a statement regarding the Cortez aggravated battery (the subject of the lineup). The statement was approximately 10 minutes long. After this conversation, Detective Johnson spoke with his lieutenant and they learned that a car used in a previous homicide matched the description of the car used in the Cortez shooting. The detectives went back into the interview room at approximately midnight. After Olivera was advised of his rights and informed of the reason for which he was being talked to, he gave a statement regarding

the homicide (the Torres case). The statement was approximately 15 minutes long. Detective Johnson had no further contact with the defendant. He did not make any attempts to contact Olivera's attorney and, to his knowledge, neither did Detective Kato.

On cross-examination, Detective Johnson stated that he first spoke with Olivera at approximately, 11 p.m., after the lineup. Detective Kato informed Olivera that he was picked out in the lineup. Detective Johnson believed those were the first words spoken by anybody in that room. The following is an excerpt of defense counsel's cross-examination of Detective Johnson:

"Q. You started questioning Mr. Olivera. Is that right sir?

A. We spoke with him.

Q. Right. This was after the line-up?

A. After the line-up.

Q. About what time was that?

A. Shortly after eleven.

Q. And when you spoke with Mr. Olivera shortly after eleven it was you and Detective Kato that spoke with Mr. Olivera? Isn't that right?

A. That's correct.

Q. And what was the first thing that either you said, Detective Kato said or Mr. Olivera said?

A. I believe he was informed he was picked out as an offender in a line-up.

Q. So it was Detective Kato who informed Mr. Olivera of this. Isn't that right?

A. That's correct.

Q. Those were the first words spoken by anybody in that room?

A. I believe so.

* * *

MR. BLOOM [Defense counsel]: After he was informed of that by Detective Kato he was picked out of a line-up that's when Detective Kato you say gave him these *Miranda* Warnings you spoke of?

A. No.

MR. BURNS [Prosecutor]: Objection. We're confusing two different conversations here.

THE COURT: Sustained.

MR. BLOOM: All right. After the line-up when he was informed he had been picked out by two witnesses by Detective Kato what was the next thing that was said?

A. I can't tell you verbatim. We were walking out of the room and he informed Detective Kato that he wasn't alone.

Q. When you had this earlier conversation Counsel says that there was two separate conversations that perhaps we're confusing. All right?

A. Correct.

Q. The one after the line-up is the one you just spoke about?

A. That's correct.

Q. There was one before the line-up?

A. Not that I recall.

Q. Where was the conversation where he was given these *Miranda* Warnings?

A. That was later on in the evening regarding a different incident.

Q. All right. Now later on in the evening what time was it that he was given these warnings?

A. It had to be around midnight."

Detective Johnson testified that around midnight Detective Kato told Olivera that he wanted to give him his rights. Detective Kato initiated the conversation. Following that is when certain admissions about a murder were made.

Detective Christon Kato testified on behalf of the State. On August 9, 1988, he was assigned to investigate the aggravated shooting of Raphino Cortez. He made arrangements for a lineup and one was conducted. Prior to the lineup, he had no conversations with the defendant; however, Officer Gilliam told him if a positive identification of Olivera was made, he had to notify defendant's lawyer. After Detective Kato notified Officer Gilliam of the results of the lineup, he began to remove all of the individuals except the defendant out of that room. The defendant remained in the same room where the lineup was conducted. Defendant asked Detective Kato, "What happened?" Kato replied that defendant had been positively identified. Subsequently, the defendant asked "What happens next?" After Detective Kato advised Olivera of his rights, Olivera told Detectives Kato and Johnson he was not alone when he shot the victim. The conversation lasted approximately 15 minutes. The detectives left the room and Kato then spoke with his lieutenant, who informed him of a similar shooting two days prior to the aggravated battery. After he received this information, he looked at the reports on the homicide. Detective Kato reentered the interview room and advised Olivera of his rights again. He inquired as to defendant's knowledge of the July 29 shooting of Raphael Torres. Prior to the conversation with the lieutenant,

Detective Kato did not know anything about the Torres murder and to his knowledge the defendant had not been a suspect. The second conversation with the defendant took place at approximately midnight. Prior to this conversation, Detective Kato again advised the defendant of his rights and informed him that the focus of his investigation was the murder of Raphael Torres. After this 15- to 20-minute conversation, Detective Kato had occasion to have another conversation with the defendant at approximately 3 a.m. An ASA and youth officer Troike were also present at this time.

John DeLeon was called to testify on behalf of the defendant. He is an attorney licensed to practice law in Illinois. DeLeon testified that on August 9, 1988, defendant's father called his office and asked for an appointment that very day. Olivera's father indicated that Officer Gilliam had stopped by his house looking for his son Joel. Prior to meeting with the Oliveras, DeLeon confirmed with Officer Gilliam that he was looking for the defendant as a suspect on an aggravated battery case. Nothing was mentioned about a murder case. After speaking with the defendant and his father in his office, DeLeon contacted Officer Gilliam, who was to wait for them at the station.

They arrived at the police station at approximately 6 p.m. and were taken to an interview room. Officer Gilliam inquired as to whether the defendant understood his *Miranda* rights and explained to Olivera that because he was 16 years old he could be charged as an adult for the aggravated battery of Raphino Cortez. At no time did Officer Gilliam tell DeLeon about any other case or investigation regarding an incident that happened several days earlier. Olivera maintained that he did not want to answer any questions. DeLeon again told Officer Gilliam that Olivera was invoking his rights and his right not to talk. Officer Gilliam responded that he understood Olivera did not wish to answer any questions other than those relating to background information. DeLeon asked Officer Gilliam that if any questioning would go on to please contact him. Officer Gilliam responded that he'd be happy to do so if DeLeon would leave him a phone number. DeLeon did not feel it was necessary at the time to remain at the police station until the witnesses were located for the lineup. Prior to leaving the police station, DeLeon left his beeper number and a card with his office number. At that time, Officer Gilliam indicated that the father could stay with the defendant. At approximately 8:30 p.m., DeLeon called the police station and asked for an update, at which time Gilliam indicated that they were still holding the defendant as a suspect on the aggravated battery, attempted murder case of Raphino Cortez and the police had been unable to locate the witnesses for the

lineup. DeLeon asked to be notified because he wanted to be present for the lineup. At about 9:30 or 10 p.m., DeLeon spoke with Officer Gilliam, who indicated a lineup had been conducted (it was kind of last minute and he really didn't get a chance to call DeLeon), someone identified Olivera on the Cortez case, Olivera would be charged for aggravated battery, attempted murder in the Cortez case and that he could go to juvenile court the following day.

When asked if he had another discussion with Officer Gilliam that night, DeLeon responded:

> "Yes, he also at that time asked if he could ask my client about a weapon that was used in that aggravated battery attempt murder case, about the location of the weapon. I told him that I didn't think I wanted my client to answer any questions about that, that I would come down to the station and talk to my client and see if he wanted to answer questions. But I indicated to him over the phone that I did not want my client questioned about a weapon because if he were to indicate he knew anything about a weapon or location of a weapon it would be the same thing as giving a statement.
>
> * * *
>
> Officer Gilliam indicated that again he would respect the defendant's rights and he would not ask anything further about any weapon and he again told me that the Court date was on the following date in Calendar Twenty, Juvenile."

The next day was the first time DeLeon learned the police had questioned Olivera about a separate murder investigation.

The defendant's father, Gerado Olivera, testified on behalf of the defendant. On August 9, 1988, he accompanied his son to an attorney's office and then to the police station. At the police station, he heard an officer giving his son his rights. The lawyer asked Olivera if he wanted to talk about the case and Olivera told him no. Mr. Olivera testified that he speaks fluent Spanish, but he also understands a little English. He heard DeLeon tell the officer that if they wanted to ask his son anything to call him. DeLeon gave the police officer his beeper number. Mr. Olivera stayed in the room with his son just a few minutes because the officer told him they were going to take his son to a lineup, and he could not stay there. Mr. Olivera remained at the station until 5 a.m.

On cross-examination the court allowed the State to question Mr. Olivera in English without the aid of an interpreter. Mr. Olivera was permitted to give his response in Spanish to the interpreter; the interpreter was not to interpret the State's questions, only Mr. Olivera's

responses. After the State questioned Mr. Olivera in English regarding the defendant's rights at the police station, the trial court stated it was pretty satisfied that Mr. Olivera understood English fairly well.

Both sides rested, and the trial judge stated he would take several minutes to review his notes. When issuing its ruling on the motion, the trial court stated the following. First, it was clear that the defendant by or through his father contacted DeLeon before contacting the police and turning himself in, and that by his actions he invoked his right to have counsel present. While at the police station the rights were read to the defendant or given to the defendant by Officer Gilliam. Defendant stated that he did not wish to talk to the police with regards to the incident for which he had turned himself in. There was some agreement between Officer Gilliam and DeLeon that DeLeon would be notified. DeLeon testified that he requested to be present for the lineup. Officer Gilliam's testimony differed in that he testified he was only to notify DeLeon of the results of the lineup if one was finally held. A lineup was held and DeLeon was made aware that his client had been identified.

The trial court noted the critical issue was who initiated the conversation and stated:

"I believe that what happened is as Officer Kato testified. After the lineup as the others were out of the room, Mr. Olivera asked Detective Kato what happened, and therefore initiated or began an exchange between the officer and the defendant. And after this a second question was asked. The defendant asked what would happen next, and then it flowed into the defendant making some statements pertaining to the aggravated battery, that he was not alone when he shot the victim in this case.

I believe it is from this, although earlier the defendant had exercised his constitutional right to remain silent and had set forth that he did not wish to speak to the police; the defendant, it is clear from the case law, both *Edwards* and *Roberson*, that the defendant after invoking his rights, and in fact, later waived them. And one of the ways that this can be done is by initiating a conversation with the police as what happened here.

\* \* \*

So I am going to—and the question that continued on from there as to the murder investigation of July 29th was also proper as a continuing investigation although new rights were—the rights were again given to the defendant prior to this questioning. I find that it was a continuous conversation between the defendant and the police as to the activity that the

defendant was involved in over a couple of day [*sic*] period of time."

The trial court denied the motion to suppress.

### Opinion

Olivera argues that this is not an appeal involving a conspicuously guilty defendant who is attempting to exploit some legal technicality in order to argue that he was deprived a fair trial for one reason or another. Olivera maintains he is innocent of the July 29, 1988, fatal shooting of Raphael Torres. He does however, concede that he is guilty of a different crime: the July 31, 1988, aggravated battery attempted shooting of Raphino Cortez. Olivera argues to this court that in making certain incriminating oral and court-reported statements to the authorities following his arrest for aggravated battery, he believed he was confessing to the Cortez shooting (which he did commit and for which he had surrendered himself to the authorities) when he answered the authorities questions regarding the Torres shooting.

Olivera argues that the statements he made concerning his involvement in the Torres murder should not have been admitted into evidence. Defendant presents three arguments to support this allegation: First, he claims that the court erred in its determination that he waived his right to counsel; second, that defendant's statements were made after his sixth amendment right to counsel had attached; and third, that the ASA should not have spoken with the defendant outside the presence of his attorney. Conversely, the State maintains that defendant's argument fails on all three propositions: First, the evidence presented proved that although defendant had an attorney when he came into the station, he knowingly waived his right to counsel when he initiated a conversation with the police after his lineup; second, defendant's sixth amendment right to counsel had not yet attached since defendant had not been formally charged in this matter; and third, since defendant waived his right to counsel, the ASA did not violate any ethical rules when he advised defendant of his rights and spoke with him about the crime. Therefore, the State maintains that the testimony presented at defendant's hearing on his motion to suppress fully supported the trial court's finding that defendant waived his right to counsel and voluntarily confessed to the shooting of Raphael Torres.

For the following reasons, we find that the trial court erred in denying the defendant's motion to suppress statements. In light of that decision, we feel we must reverse the defendant's conviction, for without the admission of Olivera's statements at trial, we believe the

case against him fails miserably. As a result of this determination we need not address the remaining issues raised by the defendant.

After initially being advised of his *Miranda* rights, the accused may himself validly waive his rights and respond to interrogation. (*North Carolina v. Butler* (1979), 441 U.S. 369, 372-76, 60 L. Ed. 2d 286, 291-94, 99 S. Ct. 1755, 1756-59.) Statements made by a suspect who earlier expressed a desire to remain silent are admissible if the police "scrupulously honored" the defendant's right to cut off questioning. (*Michigan v. Mosley* (1975), 423 U.S. 96, 104, 46 L. Ed. 2d 313, 321, 96 S. Ct. 321, 326.) Webster's Dictionary defines "scrupulously" as "conscientiously, painstakingly." (Webster's Third New International Dictionary 2043 (1986).) The United States Supreme Court, having provided that interrogation must cease if an individual invokes his *Miranda* rights, has also addressed the conditions under which an interrogation may be resumed. The Supreme Court has held, with regard to the right to counsel under the fifth and fourteenth amendments, that when an accused has invoked the right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation, even if he has been advised of his rights. (*Edwards v. Arizona* (1981), 451 U.S. 477, 484, 68 L. Ed. 2d 378, 386, 101 S. Ct. 1880, 1884-85.) In addition, the Court held "an accused *** having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." (*Edwards*, 451 U.S. at 484-85, 68 L. Ed. 2d at 386, 101 S. Ct. at 1884-85; see also *People v. Humphries* (1991), 223 Ill. App. 3d 81, 89, 584 N.E.2d 996.) In determining whether the accused waived his right to counsel, the question becomes "whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Edwards*, 451 U.S. at 486 n.9, 68 L. Ed. 2d at 387 n.9, 101 S. Ct. at 1885 n.9.

In *Oregon v. Bradshaw* (1983), 462 U.S. 1039, 1044, 77 L. Ed. 2d 405, 412, 103 S. Ct. 2830, 2834, the United States Supreme Court stated that "even if a conversation taking place after the accused has 'expressed his desire to deal with the police only through counsel' is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present dur-

ing interrogation." (See also *Edwards*, 451 U.S. at 486 n.9, 68 L. Ed. 2d at 387 n.9, 101 S. Ct. at 1885 n.9.) The preliminary inquiry is whether the defendant initiated the conversation in a manner evincing a "willingness and a desire for a generalized discussion about the investigation." (*Bradshaw*, 462 U.S. at 1045-46, 77 L. Ed. 2d at 412, 103 S. Ct. at 2835.) This is to be contrasted with inquiries into the routine aspects of custody, such as asking for a drink of water or to make a telephone call. (*Bradshaw*, 462 U.S. at 1045-46, 77 L. Ed. 2d at 412, 103 S. Ct. at 2835.) In *Bradshaw*, the defendant asked, "Well, what is going to happen to me now?" (*Bradshaw*, 462 U.S. at 1045-46, 77 L. Ed. 2d at 412, 103 S. Ct. at 2835.) The Supreme Court found that, although somewhat ambiguous, this question indicated a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship.[2]

After determining that there was not a violation of the *Edwards* rule, the Supreme Court stated that the next inquiry was " 'whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.' " (*Bradshaw*, 462 U.S. at 1046, 77 L. Ed. 2d at 413, 103 S. Ct. at 2835, quoting *Edwards*, 451 U.S. at 486 n.9, 68 L. Ed. 2d at 387 n.9, 101 S. Ct. at 1885 n.9.) This determination depends upon " 'the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused.' " *North Carolina v. Butler* (1979), 441 U.S. 369, 374-75, 60 L. Ed. 2d 286, 293, 99 S. Ct. 1755, 1758, quoting *Johnson v. Zerbst* (1938), 304 U.S. 458, 464, 82 L. Ed. 1461, 1466, 58 S. Ct. 1019, 1023.

---

[2]After the defendant inquired, "Well, what is going to happen to me now?" the police officer answered: "You don't have to talk to me. You have requested an attorney and I don't want you talking to me unless you so desire because anything you say—because—since you requested an attorney, you know, it has to be at your own free will." The defendant stated he understood and there followed a discussion between the defendant and the police officer. (*Bradshaw*, 462 U.S. at 1042, 77 L. Ed. 2d at 410, 103 S. Ct. at 2833.) The Supreme Court held that the above statement could have reasonably been interpreted by the officer as relating generally to the investigation and that the police officer so understood is apparent from the fact that he immediately reminded the accused that "[you] do not have to talk to me," and it was only after the accused told him that he "understood" that they had a generalized discussion. *Bradshaw*, 462 U.S. at 1045-46, 77 L. Ed. 2d at 412, 103 S. Ct. at 2835.

In *Arizona v. Roberson* (1988), 486 U.S. 675, 100 L. Ed. 2d 704, 108 S. Ct. 2093, the Supreme Court emphasized the virtues of a bright-line rule to assist law enforcement personnel and courts in applying the *Miranda* requirements and noted that when an accused asserts his right to counsel, he has indicated that he considers himself unable to deal with the pressures of custodial investigation without legal assistance. Thus, the court held that a suspect's request for counsel should be applied to any questions the police may pose, not only those relating to a specific investigation. *Roberson*, while adopting the bright-line rule of *Edwards* that all interrogation must cease when a suspect requests an attorney, also acknowledged the holding of *Edwards* that the accused may waive his right to counsel by himself initiating further communications, exchanges or conversations with the police. *Roberson*, 486 U.S. at 682-83, 100 L. Ed. 2d at 714, 108 S. Ct. at 2098.

In *Roberson*, the defendant was arrested for burglary. A police officer advised the defendant of his *Miranda* rights. In response, the defendant informed the police officer that he wanted to speak to an attorney before he answered any questions. Although the arresting officer noted this fact in his written report of the incident, the defendant was not given an opportunity to consult with an attorney. Three days after the initial interrogation, and while the defendant was still in custody, another police officer advised the defendant of his *Miranda* rights and questioned him about an unrelated burglary. The second police officer was unaware that the defendant had requested an opportunity to speak with counsel when he was questioned about the first burglary charge. During this second interrogation, the defendant made an incriminating statement about the second burglary which he later sought to have suppressed. The Supreme Court determined that the defendant's incriminating statements were obtained in violation of his fifth amendment right to counsel. The Court held that the rule enunciated in *Edwards* precluded the authorities from interrogating an accused following the accused's request for counsel in the context of a separate investigation. (*Roberson*, 486 U.S. at 682, 100 L. Ed. 2d at 714, 108 S. Ct. at 2098.) The Court specifically noted that "the presumption raised by a suspect's request for counsel—that he considers himself unable to deal with the pressures of custodial interrogation without legal assistance—does not disappear simply because the police have approached the suspect, still in custody, still without counsel, about a separate investigation." *Roberson*, 486 U.S. at 683, 100 L. Ed. 2d at 715, 108 S. Ct. at 2099.

In *People v. Hicks* (1989), 132 Ill. 2d 488, 548 N.E.2d 1042, the Illinois Supreme Court reiterated the two-step inquiry set forth in *Bradshaw*: (1) whether defendant initiated the conversation in a manner evincing a "willingness and a desire for a generalized discussion about the investigation" (*Bradshaw*, 462 U.S. at 1045-46, 77 L. Ed. 2d at 412, 103 S. Ct. at 2835); and (2) whether, by defendant's initiation of a conversation, coupled with the totality of the other circumstances, he knowingly and intelligently waived his right to counsel's presence during questioning. The court then addressed whether when the defendant waived his right to counsel by initiating the conversation with the police regarding his involvement in the crime with which he was charged, the police were thereby authorized to interrogate the defendant concerning other crimes.[3] The court held:

> "The fact that the topic of conversation shifted to another crime after defendant's waiver of his rights does not render his confession involuntary. The proper inquiry focuses on the custodial atmosphere, not the specific line of questioning." *Hicks*, 132 Ill. 2d at 495-96.

The State maintains that the defendant's question to Detective Kato, "What happened?" initiated a conversation concerning the investigation. The State argues that this question is strikingly similar to the respective questions posed by the defendants in *Oregon v. Bradshaw* (462 U.S. at 1045-46, 77 L. Ed. 2d at 412, 103 S. Ct. at 2835) and in *People v. Bell* (1991), 217 Ill. App. 3d 985, 996-97, 577 N.E.2d 1228.

We find that although the questions in *Bradshaw* and *Bell* are somewhat similar to the present case, the totality of the circumstances is quite different. As discussed earlier, the court in *Bradshaw* found that although the defendant's statement was ambiguous, the totality of the circumstances indicated that the defendant evinced a willingness to discuss the case. In the present case, Olivera's statement was more vague than the question in *Bradshaw*, there was nothing to indicate that Olivera understood his rights as in *Bradshaw*, Olivera

---

[3]In *Hicks*, the Illinois Supreme Court determined that the defendant knowingly and intelligently waived his fifth amendment right to counsel. However, prior to reaching this result the court noted Hicks gratuitously offered exculpatory statements, such statements having been made after the police officer again admonished him not to speak in the absence of his attorney, that the police officer had advised defendant of his *Miranda* rights on several occasions in both oral and written form, and finally, that the defendant was sufficiently familiar with the criminal justice system to realize that "he had the right to keep quiet until his attorney was present." *Hicks*, 132 Ill. 2d at 493, 548 N.E.2d at 1044.

was 16 years old with no prior experience with the police, and he surrendered himself to the police in the company of his father and his lawyer.

In *People v. Bell* (1991), 217 Ill. App. 3d 985, 997, 577 N.E.2d 1228, the testimony indicated that the defendant had asked, "[W]hat are the charges against me?" and the court held that the defendant's question clearly related to the investigation and therefore should suffice to constitute "initiation" of communications by the defendant. The court noted that defendant was advised of his rights several times, both in written form and orally, twice after he indicated he wanted to tell his story. Bell also had several prior convictions; thus, it is obvious that he had some prior experience with the criminal justice system. We believe that Olivera's statement was more vague than the defendant's statement in *Bell* and that the totality of the circumstances makes the present case distinguishable.

The State acknowledges that it is the State's burden to prove that defendant waived his rights per *Miranda*; however, proof of the waiver beyond a reasonable doubt is not required. (*People v. Rogers* (1988), 123 Ill. 2d 487, 495, 528 N.E.2d 667.) The test of voluntariness is whether the statement was made freely, voluntarily and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he confessed. (*People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601.) The trial court's role is to resolve all issues of credibility and the trial court's ruling on a motion to suppress will not be disturbed unless the finding is contrary to the manifest weight of the evidence. *People v. Clark* (1986), 114 Ill. 2d 450, 457, 501 N.E.2d 123.

The State argues that in the present case the trial judge noted the differences in testimony presented by Detectives Kato and Johnson and then resolved the issue in favor of the State and found that defendant initiated a conversation with Detective Kato and therefore waived his right to counsel. The State maintains that the trial court's ruling acknowledged the differences between the testimony of the detectives and he determined that Detective Kato's version was more credible. However, the trial judge here did not indicate if he was determining whether the police "scrupulously" honored defendant's previous exercise of his right to remain silent. In fact the trial judge merely stated: "It is clear from case law that the defendant after invoking his rights and in fact later waived them. And one of the ways this can be done is by inviting a conversation with the police as what happened here." However, the fact that a defendant was the one who initiated a conversation is a fact that is necessary but not sufficient to

determine whether subsequent events indicate a waiver of defendant's previously invoked rights. *People v. Bell* (1991), 217 Ill. App. 3d 985, 997, 577 N.E.2d 1228.

The State maintains that the testimony presented at the hearing and at trial fully supports the trial court's ruling that defendant knowingly and intelligently waived his right to counsel. Voluntariness is determined by consideration of the totality of the circumstances. Factors to be considered in determining admissibility of a statement made after an initial refusal to make one are whether there was a significant period of time between the defendant's exercise of his right to remain silent and the requestioning; whether the requestioning was preceded by *Miranda* warnings; and whether a different officer conducted the second questioning. *People v. Reyes* (1989), 181 Ill. App. 3d 246, 255, 536 N.E.2d 990.

The trial court found, and we agree, that Olivera initially invoked his right to remain silent and his right to counsel. Therefore, we must look to whether defendant waived these rights by subsequently initiating communication with the authorities, evincing a desire to have a generalized discussion about the investigation, and if by initiating a conversation, coupled with the totality of the other circumstances, he knowingly and intelligently waived his right to remain silent and to counsel's presence during questioning.

On August 9, 1988, Olivera was arrested for the July 31, 1988, aggravated battery of Raphino Cortez when he voluntarily surrendered himself at the police station. Olivera was accompanied by his Spanish-speaking father, Gerado Olivera, and his attorney, John DeLeon. Olivera was a 16-year-old high school freshman and had no prior criminal history or experience with the police. Detective Kato testified that at the conclusion of the lineup in the Cortez case, the police removed all the other individuals except Olivera from the room and then the defendant asked, "What happened?" After being told he had been identified in a lineup, defendant asked "What happens next?" The testimony of DeLeon and Officer Gilliam differs as to whether DeLeon was to be called before or after the lineup. However, DeLeon further testified that when he spoke with Officer Gilliam after the lineup, he indicated that he did not want his client questioned and if the police wanted to do so, he would come down to the station to be present.

We find that given the circumstances surrounding the defendant's statement, "What happened?" the defendant did not initiate a conversation evincing a desire to have a generalized discussion of the investigation. Moreover, even if it could be found that the defendant initi-

ated such a conversation, we find that considering the totality of the circumstances, Olivera did not knowingly and intelligently waive his right to counsel's presence during questioning.

Finally, Olivera also claims that ASA Cummings violated our nebulous rules of professional ethics when he interviewed defendant without his counsel present. Although we believe common civility would dictate that the ASA would call a defendant's lawyer when he knows that the defendant has retained counsel, nothing in the rules prohibits an ASA from questioning a defendant he believes has intelligently waived his right to counsel.

We find that the trial court's decision to deny the defendant's motion to suppress oral and court-reported statements was against the manifest weight of the evidence in this case. Therefore, we reverse the decision of the trial court on the motion to suppress statements. However, since the State did not present any physical evidence to link Olivera to the crime and there were no witnesses who could identify Olivera, we find that without Olivera's statements, the State did not present any evidence to link Olivera to the fatal shooting of Raphael Torres. Accordingly, we reverse the defendant's conviction.

Reversed.

GORDON, P.J., and McNULTY, J., concur.