(No. 75598.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. JOEL OLIVERA, Appellee.

*Opinion filed January 19, 1995.—Rehearing denied April 3, 1995.*

BILANDIC, C.J., joined by HEIPLE, J., concurring in part and dissenting in part.

Roland W. Burris and James E. Ryan, Attorneys General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen and Arleen C. Anderson, Assistant Attorneys General, of Chicago, and Renee G. Goldfarb, James E. Fitzgerald, Christine Perille and Kenneth T. McCurry, Assistant State's Attorneys, of counsel), for the People.

Michael J. Pelletier, Deputy Defender, and Patricia Unsinn, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago (James A. Clark and Jay Williams, of Schiff, Hardin & Waite, of Chicago, of counsel), for appellee.

JUSTICE HARRISON delivered the opinion of the court:

In the circuit court of Cook County a jury convicted the defendant, Joel Olivera, of the first degree murder of Raphael Torres, for which a sentence of 35 years was imposed. Upon review the appellate court concluded not only that the trial court had erred by denying the defendant's motion to suppress his inculpatory statements but also that without these statements the evi-

dence was insufficient to prove him guilty beyond a reasonable doubt. As a consequence the appellate court reversed the defendant's conviction without remanding the cause for retrial. (246 Ill. App. 3d 921.) We granted the State leave to appeal (145 Ill. 2d R. 315).

The issue presented concerning the defendant's motion to suppress is the relatively narrow one of whether, after having invoked his right to the presence of counsel during custodial interrogation, the defendant waived that right by initiating a conversation with the police in a manner evincing a willingness and a desire for a generalized discussion about the investigation and by knowingly and intelligently choosing to speak with law enforcement authorities in the absence of counsel. At the hearing on the motion to suppress, testimony disclosed that the defendant, who was 16 years old when Raphael Torres was murdered on July 29, 1988, had been sought as a suspect in an unrelated offense, namely, the aggravated battery or attempted murder of Rafino Cortez committed two days later on July 31, 1988. In the company of both his father and his attorney, defendant came to the police station at about 6:45 p.m. on August 9, 1988, and met with Officer Darryl Gilliam concerning the shooting of Rafino Cortez. It is not disputed that Officer Gilliam advised defendant of his rights pursuant to *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, and that defendant indicated in the presence of his attorney and his father that he did not wish to speak with the officer beyond providing background information for the arrest report.

Shortly thereafter defense counsel left the police station. Later in the evening, not long before Officer Gilliam went off duty, the officer turned the defendant over to Detective Christon Kato, advising the detective, according to the officer's testimony, that the defendant had surrendered himself with his attorney, that the of-

ficer had arrested defendant, that the officer had advised defendant of his rights pursuant to *Miranda*, and that defendant's attorney had instructed defendant to make no statement and to give the officer no information about the shooting of Rafino Cortez. A short time later a lineup was conducted in which two witnesses identified the defendant with respect to the shooting of Rafino Cortez.

Detective Kato testified at the suppression hearing that at about 9 p.m. on August 9, 1988, he had been assigned to investigate the shooting of Rafino Cortez. When he learned later that the defendant was in custody, he arranged for a lineup, which was conducted, he said, at about 10:45 that evening. Detective Kato testified further that after he had removed the other persons from the room where the lineup had been conducted, the defendant remained in the room "at which time he asked me what happened." Detective Kato responded, he said, by telling defendant that he had been "positively identified." Then, the detective testified, defendant "stated that he wanted to know what happens next. I told him I wanted to advise him of his rights, and I advised him of his rights at that time." After the defendant stated that he understood each right as the detective informed him of it, defendant said that he had not been alone when he shot Rafino Cortez.

Following a conversation of about 15 minutes' duration at which his partner, Detective Wayne Johnson, was also present, Detective Kato's lieutenant summoned Detective Kato to his office and apprised him of a gang-related shooting similar to that of Rafino Cortez that had occurred two days earlier in the same area and had involved a car of similar description. Prior to his conversation with the lieutenant, Detective Kato had no knowledge of the homicide. After reviewing the reports about it, Detective Kato returned to the room where de-

fendant was being held, advised him of his rights, and inquired whether he had any knowledge of the shooting of Raphael Torres on July 29, 1988. The defendant stated that he understood his rights, and a conversation of about 15 or 20 minutes' duration ensued during which the defendant made inculpatory remarks about the homicide. Later, at about 3:30 a.m., Detective Kato had another conversation with the defendant at which an assistant State's Attorney and a youth officer were present and during which defendant made further inculpatory admissions with respect to the homicide. Still later, at 5:38 a.m., in the presence of these same three persons the defendant gave a court-reported inculpatory statement concerning the homicide. Detective Kato testified that the defendant never asked to speak to his attorney and that at no time had he told the defendant he could not talk to his attorney.

Detective Johnson's account of the conversation with defendant following the lineup differed dramatically from that of Detective Kato in certain important respects addressed during cross-examination. On direct examination by the State, Detective Johnson testified that, together with Detective Kato, he had conducted a lineup concerning the shooting of Rafino Cortez in which the defendant had been identified and after which the defendant had given a statement of about 10 minutes' duration concerning the shooting of Rafino Cortez, which was the subject of the lineup. Thereafter the witness and Detective Kato spoke with Lieutenant Phalon, from whom they learned about the homicide two days earlier. Following their return to the interview room where the defendant was being held, Detective Kato advised the defendant of his rights pursuant to *Miranda*. After the defendant stated that he understood his rights, he was asked whether he would speak to the detectives and was informed of the investigation into the homi-

cide. A 15-minute conversation with the defendant concerning the homicide took place. On cross-examination Detective Johnson expressed the belief that following the lineup Detective Kato, rather than defendant, had been the first to speak when Detective Kato informed defendant, at about 11 p.m., that he had been picked out during the lineup as an offender. In response the defendant stated to Detective Kato that he had not been alone. Not until around midnight, Detective Johnson testified, prior to the initial conversation with defendant concerning the homicide, did Detective Kato advise defendant of his rights pursuant to *Miranda*.

Following the hearing on the defendant's motion to suppress, the circuit court expressed the belief that "what happened is as Officer Kato testified" and concluded that by asking "What happened?" the defendant had initiated an exchange with the detective and had thereby waived his rights after invoking them. The circuit court observed that thereafter the defendant had asked a second question, "What happens next?" that, in the words of the court, "flowed into the defendant['s] making some statements pertaining to the aggravated battery, that he was not alone when he shot the victim in [that] case." As a consequence of the defendant's waiver of his rights, the circuit court denied his motion to suppress.

If after being informed of the right to have counsel present, an accused states that he wants an attorney, interrogation must cease until an attorney is present, and at that time the accused must have an opportunity to confer with the attorney and to have the attorney present during any subsequent questioning. (*Miranda v. Arizona* (1966), 384 U.S. 436, 474, 16 L. Ed. 2d 694, 723, 86 S. Ct. 1602, 1628.) An accused who has expressed the desire to deal with police only through counsel is not subject to further interrogation by authorities until

counsel has been made available to him, unless the accused himself initiates further communications, exchanges, or conversations with the police. (*Edwards v. Arizona* (1981), 451 U.S. 477, 484-85, 68 L. Ed. 2d 378, 386, 101 S. Ct. 1880, 1884-85.) Even if the accused initiates a conversation that takes place after he has expressed the desire to deal with the police only through counsel, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the fifth amendment right to have counsel present during the interrogation. (*Oregon v. Bradshaw* (1983), 462 U.S. 1039, 1044, 77 L. Ed. 2d 405, 412, 103 S. Ct. 2830, 2834.) As this court observed in *People v. Hicks* (1989), 132 Ill. 2d 488, 492, the Supreme Court defined in *Oregon v. Bradshaw* (1983), 462 U.S. 1039, 77 L. Ed. 2d 405, 103 S. Ct. 2830, the approach courts should take when addressing the question whether a defendant has waived this right, once invoked. The court's preliminary inquiry is whether the defendant, rather than the police, initiated the conversation in a manner evincing a "willingness and a desire for a generalized discussion about the investigation." (*Bradshaw*, 462 U.S. at 1045-46, 77 L. Ed. 2d at 412, 103 S. Ct. at 2835; *Hicks*, 132 Ill. 2d at 493.) If the court determines that the accused initiated the conversation in a way evincing a willingness and a desire for a generalized discussion concerning the investigation, it must make one other inquiry in determining whether a defendant has waived his right to the presence of counsel and his right to remain silent during custodial interrogation: whether the accused, by his or her initiation of such a conversation, coupled with the totality of the other circumstances, knowingly and intelligently waived this right. *Bradshaw*, 462 U.S. at 1046, 77 L. Ed. 2d at 413, 103 S. Ct. at 2835; *Hicks*, 132 Ill. 2d at 493.

In the instant case the defendant's question "What

happened?" posed to Detective Kato immediately following the conclusion of the lineup cannot be said to evince on the defendant's part a willingness and a desire for a generalized discussion concerning the investigation. To ascribe such significance to this limited question would render virtually any remark by a defendant, no matter how offhand or superficial, susceptible of interpretation as an invitation to discuss his case in depth. To do so would amount to a perversion of the rule fashioned in *Edwards* and articulated more fully in *Bradshaw*.

We notice that when the defendant in *Bradshaw* asked, "Well, what is going to happen to me now?" the officer answered by saying, "You do not have to talk to me. You have requested an attorney and I don't want you talking to me unless you so desire because anything you say—because—since you have requested an attorney, you know, it has to be at your own free will." (*Bradshaw*, 462 U.S. at 1042, 77 L. Ed. 2d at 410, 103 S. Ct. at 2833.) Here, by contrast, Detective Kato did not respond with any such warnings but, instead, answered the defendant's question. Although the detective did not interrogate defendant further at this juncture, the detective's response was one that could and did elicit further comment by the defendant and culminated in the incriminating statements defendant sought ultimately to suppress.

The safeguards of *Miranda* come into play whenever a person in custody is subjected not only to express questioning but also to its functional equivalent. (*Rhode Island v. Innis* (1980), 446 U.S. 291, 300-01, 64 L. Ed. 2d 297, 307-08, 100 S. Ct. 1682, 1689.) The term "interrogation" under *Miranda* refers both to express questioning and to any words or actions on the part of the police, other than those normally accompanying arrest and custody, that the police should know are reasonably likely to elicit an incriminating response from the

suspect. (*Innis*, 446 U.S. at 301, 64 L. Ed. 2d at 308, 100 S. Ct. at 1689-90.) In determining whether a statement is one reasonably likely to elicit such a response, the focus is primarily upon the perceptions of the suspect rather than upon the intent of the police. (*Innis*, 446 U.S. at 301, 64 L. Ed. 2d at 308, 100 S. Ct. at 1689-90.) The answer of Detective Kato was one that the detective should have known would be reasonably likely to elicit an incriminating response from the defendant. If a question by an accused who has invoked his right to the presence of counsel during custodial investigation is to be deemed an initiation of a conversation in a manner evincing a willingness and a desire for a generalized discussion concerning the investigation, the proper response of the police to such a question must be to advise the accused of his rights, as was done by the officer in *Bradshaw*, and not to provide an answer, in the absence of such warnings, that police should know is reasonably likely to elicit an incriminating response.

Inasmuch as we hold that the defendant did not initiate the conversation in a manner evincing a willingness and desire for a generalized discussion concerning the investigation, we need not make the further inquiry required by *Bradshaw* to be made after a court has determined that an accused has initiated such a conversation. Therefore, we affirm the judgment of the appellate court insofar as it reverses the circuit court's denial of the defendant's motion to suppress his inculpatory statements.

We turn now to the State's contention that the appellate court, having found error in the circuit court's denial of the defendant's motion to suppress, committed a further error by reversing the judgment of defendant's conviction without remanding the cause for a new trial. After observing that the State presented no physical evidence linking defendant to the crime and no witnesses

who could identify him, the appellate court found that without defendant's statements the State presented no evidence linking him to the shooting of Raphael Torres and reversed his conviction for first degree murder.

The double jeopardy clause forbids a second, or successive, trial for the purpose of affording the prosecution another opportunity to supply evidence it failed to muster in the first proceeding. (*Burks v. United States* (1978), 437 U.S. 1, 11, 57 L. Ed. 2d 1, 9, 98 S. Ct. 2141, 2147.) As this court acknowledged in *People v. Mink* (1990), 141 Ill. 2d 163, 173, for purposes of double jeopardy the United States Supreme Court has distinguished between judgments reversing convictions on account of trial error and judgments reversing convictions on account of evidentiary insufficiency. Reversal for trial error is a determination that the defendant has been convicted by means of a judicial process defective in some fundamental respect, whereas reversal for evidentiary insufficiency occurs when the prosecution has failed to prove its case, and the only proper remedy is a judgment of acquittal. (*Mink*, 141 Ill. 2d at 173.) Although the double jeopardy clause precludes the State from retrying a defendant after a reviewing court has determined that the evidence introduced at trial was legally insufficient to convict, the double jeopardy clause does not preclude retrial of a defendant whose conviction has been set aside because of an error in the proceedings leading to the conviction. (*Mink*, 141 Ill. 2d at 173-74.) Moreover, retrial is permitted even though evidence is insufficient to sustain a verdict once erroneously admitted evidence has been discounted, and for purposes of double jeopardy all evidence submitted at the original trial may be considered when determining the sufficiency of the evidence. *Lockhart v. Nelson* (1988), 488 U.S. 33, 40, 102 L. Ed. 2d 265, 273, 109 S. Ct. 285, 290; *People v. Avery* (1989), 180 Ill. App. 3d 146, 157.

Here the appellate court determined that the evidence against the defendant was insufficient to sustain a verdict after it discounted the evidence improperly admitted as a result of the circuit court's error in denying the defendant's motion to suppress his inculpatory statements. Because the defendant's conviction was set aside on account of a trial error, the appellate court erred in failing to consider all of the evidence submitted at the original trial when it resolved the question of the sufficiency of the evidence. However, for purposes of judicial economy, rather than remand this cause of action to the appellate court for reconsideration of this question, we address it ourselves. See *People v. Taylor* (1979), 76 Ill. 2d 289, 309.

Although the defendant maintains that the evidence adduced by the State at trial was legally insufficient to convict him even when his inculpatory statements are included in an assessment of the sufficiency of the evidence, we must disagree. The defendant advances this position principally because the physical evidence presented by the State is at odds in some respects with the defendant's description of his commission of the offense. In his signed court-reported statement to police defendant said that on July 29, 1988, at about 10:30 p.m. he was riding with White Boy in the passenger seat of White Boy's car, after having met him in front of defendant's house. While riding with White Boy, he saw seven members of a gang, namely, the Bishops, who, he stated, "started representing on us and throwing bottles." The defendant stated further that he is a member of a street gang called the Morgan Boys, whose members do not get along with members of the Bishops, that White Boy gave him a gun from under the driver's seat, and that defendant started shooting "[a]t the crowd," firing "[t]wo to seven times."

By contrast, Alvaro Dominguez testified at trial that

on the night in question he was with a friend who lived near the intersection in Chicago where the shooting occurred when he and his friend saw a youth crossing the intersection alone. As the youth did so, he said, a car, which had stopped at the stop sign at the intersection, slowly entered the intersection. The witness testified that he heard "something said" by someone in the car or by the youth "[a]nd then after something was said, a shot was fired." After the witness heard the single shot, which occurred when the car was approximately in the middle of the intersection, he "saw the youth stumble onto the sidewalk and out of view and the car take off northbound." Although the witness was unsure of the number of persons in the car, he thought that there were two, the driver and a person seated in the passenger seat behind the driver. The witness said that there could have been someone in the front passenger's seat but that he was uncertain about this detail. Shortly after the witness heard the shot fired, he saw the victim on the driver's side of the car. Although it is not clear from the record on review exactly how far from the intersection the witness was when he saw and heard these things, he testified on redirect examination that from his point of view "down the block" he saw silhouettes of people in the car but would be unable to identify anyone in it.

An evidence technician testified that there was only one street light at this intersection at the time, describing it as the "old type" no longer common in Chicago, not "that bright sodium light like we have now." One discharged cartridge case was found lying in the intersection. During the course of their investigation police found only one shell casing. The forensic pathologist who had performed an autopsy on the body of the victim testified that there was a gunshot entry wound on the right upper chest and that the victim had died of that gunshot wound.

The defendant, who did not testify at trial, presented an alibi defense through the testimony of two neighbors who said that they had each been sitting outside during the evening in question and had observed the defendant outside as well.

The relevant question to ask in reviewing the sufficiency of the evidence to support a criminal conviction is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Young* (1989), 128 Ill. 2d 1, 49.) During closing argument the State proposed that although defendant admitted participation in the offense in his statement to police, he was not entirely honest in the account he gave, preferring instead to interject into his account self-serving, albeit false, details suggesting that he had acted out of fear in taking the life of another. Particularly since nothing about the evidence adduced demonstrates that the defendant was aware of the presence of an eyewitness to the shooting of Raphael Torres and, in fact, the eyewitness who testified was standing some distance from the intersection where the shooting occurred at night in an area not brightly illuminated, the discrepancies in defendant's court-reported account may stem, in part, as the State argued in rebuttal during closing argument, from the defendant's mistaken belief that he had committed the offense unobserved. Whatever inferences the jury actually drew from the evidence, a review of the record in the light most favorable to the prosecution makes abundantly clear that a rational trier of fact could have found the essential elements of first degree murder beyond a reasonable doubt. Therefore, the cause should have been remanded to the circuit court for retrial, and the appellate court erred by reversing the judgment of the circuit court without doing so.

For the reasons stated, we affirm the judgment of the appellate court insofar as it reverses the judgment of the circuit court in denying the defendant's motion to suppress his inculpatory statements, but we reverse the judgment of the appellate court insofar as it reverses the judgment of the circuit court for insufficient evidence, and we remand the cause to the circuit court for retrial.

> *Appellate court affirmed in part*
> *and reversed in part;*
> *circuit court reversed;*
> *cause remanded.*

CHIEF JUSTICE BILANDIC, concurring in part and dissenting in part:

I agree with the majority's conclusion that the evidence presented at the defendant's trial, when viewed in the light most favorable to the prosecution, was sufficient to support the defendant's murder conviction. I do not agree, however, with the majority's conclusion that the police initiated a conversation with the defendant after he invoked his right to counsel in violation of the rule established in *Edwards v. Arizona.* I would find, instead, that the defendant, after invoking his right to counsel, initiated a conversation with the police evincing a willingness and desire for a generalized discussion about the investigation.

The Supreme Court, in *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880, articulated the general rule that once a defendant invokes his right to have counsel present during interrogation, all questioning must cease until counsel is actually present, *unless* the accused himself initiates further communication, exchanges, or conversations with the police. In *Oregon v. Bradshaw* (1983), 462 U.S. 1039, 77 L. Ed. 2d 405, 103 S. Ct. 2830, the Court outlined the approach courts should follow in determining whether a defen-

dant who invokes his right to counsel, but later initiates a conversation with the police, has actually waived his right to have counsel present during custodial interrogation. The preliminary inquiry is whether the defendant initiated the conversation in a manner evincing a willingness and a desire for a generalized discussion about the investigation. (*Bradshaw*, 462 U.S. at 1045-46, 77 L. Ed. 2d at 412, 103 S. Ct. at 2835.) The second inquiry is whether the totality of the circumstances, including the fact that the defendant initiated a conversation with the police, demonstrates that the defendant knowingly and intelligently waived his right to counsel's presence during questioning. *Bradshaw*, 462 U.S. at 1045-46, 77 L. Ed. 2d at 412-13, 103 S. Ct. at 2835.

The majority never addresses the second prong of the *Bradshaw* inquiry, because it finds that the police, rather than the defendant, initiated the conversation following the defendant's invocation of his right to counsel. In reaching this conclusion, the majority adds a new element to the *Bradshaw* two-part inquiry. The majority states that, when a defendant asks a question, the answer to which may elicit an incriminating response, the police must first remind the defendant of his right to have counsel present during questioning. The opinion cites no authority for this proposition. To the extent that the opinion relies upon *Bradshaw* as support for this rule, it is wrong. *Bradshaw* does not expressly or implicitly adopt such a requirement. In fact, the *Bradshaw* opinion discussed the police officer's response to the defendant's question only in the context of finding that the defendant's question could be, and was, understood as indicating the defendant's desire to engage in a generalized discussion of the investigation. Nothing in *Bradshaw* supports the majority's conclusion that the police must, in all cases, reissue *Miranda*

warnings to a defendant who initiates further communication with the police after invoking his right to counsel.

Even assuming that the majority is correct in adopting such a requirement, it completely fails to acknowledge that the police here *did* remind the defendant of his right to have counsel present during questioning *before* the defendant made incriminating statements. Officer Kato testified at the suppression hearing that the defendant, after the lineup, asked, "What happened?" Officer Kato told the defendant that he had been positively identified. The defendant then stated that he wanted to know what would happen next. Officer Kato testified that he readvised the defendant of his *Miranda* rights and the defendant indicated that he understood those rights. Officer Kato testified that the defendant made incriminating statements only *after* he was reminded of his rights. Although Officer Kato's testimony differed, in some respects, from the testimony of another officer who participated in the investigation, the trial court, in denying the defendant's motion to suppress, specifically stated, "I believe that what happened is as Officer Kato testified."

Thus, even if the majority's newly fashioned rule is applied to the facts of this case, it is apparent that the first part of the two-part test set forth in *Bradshaw* is satisfied here. In *Bradshaw*, the defendant asked, "Well, what is going to happen to me now?" (*Bradshaw*, 462 U.S. at 1045-46, 77 L. Ed. 2d at 412, 103 S. Ct. at 2835.) The Supreme Court found that this question *did* evince a desire for generalized discussion about the investigation. (*Bradshaw*, 462 U.S. at 1045-46, 77 L. Ed. 2d at 412, 103 S. Ct. at 2835.) The Court contrasted the defendant's question with inquiries, such as a request for a drink of water or a request to use the telephone, which are so routine that they do not represent a desire

to open up a generalized discussion of the investigation. Here, the defendant's questions did not relate to a routine aspect of custody. Rather, the defendant's questions clearly related to the investigation and evinced a desire to discuss the investigation. The majority's finding to the contrary conflicts with the Supreme Court's decision in *Bradshaw*.

I would find that the defendant's questions evinced a willingness and desire for a generalized discussion of the investigation. Because the first part of the *Bradshaw* inquiry is satisfied, the majority should have addressed the second part of that test. Specifically, the majority should have considered whether the totality of the circumstances, including the fact that the defendant reopened the dialogue with the police, indicated that the defendant waived his previously invoked right to counsel.

JUSTICE HEIPLE joins in this partial concurrence and partial dissent.