# Illinois Official Reports

## Appellate Court

---

### *People v. Palmer*, 2017 IL App (1st) 151253

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RONALD PALMER, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-15-1253 |
| Filed | November 21, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-10795; the Hon. Erica L. Reddick, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Mario Kladis, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Joseph Alexander, and Michelle Corda, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE MASON delivered the judgment of the court, with opinion.<br>Presiding Justice Neville and Justice Hyman concurred in the judgment and opinion. |

¶ 1  Following a bench trial, defendant Ronald Palmer was convicted of possession of a controlled substance with intent to deliver and sentenced to six years in prison. On appeal, Palmer contends that his conviction should be reversed because the trial court erred in finding that the sole testifying police officer's surveillance location was privileged. Palmer argues that the "surveillance location privilege" should be rejected as a matter of law; asserts that even if the privilege is valid, disclosure was merited here because the State's case turned exclusively on the surveillance officer's uncorroborated testimony; and contends that application of the privilege in his case was not harmless. In the alternative, Palmer contends that the mittimus should be corrected to reflect the accurate name and class of the offense of which he was convicted.

¶ 2  Because we agree that the surveillance officer's location should have been disclosed and that the lack of disclosure deprived Palmer of a fair trial, we reverse and remand for a new trial.

¶ 3  Palmer's conviction arose from the events of May 11, 2013. Following his arrest, Palmer was charged by information with one count of possession with intent to deliver between 1 and 15 grams of heroin within 1000 feet of a church. Before trial, the State amended the charge to strike the element of being within 1000 feet of a church. Also before trial, a codefendant, Marc Hardiman, pled guilty to one count of possession of less than 15 grams of heroin in exchange for a sentence of 18 months in prison.

¶ 4  At trial, Chicago police officer Paul Zogg, a 15-year veteran of the police force, testified that on May 11, 2013, he and his partner, Officer J. Rojas, were working as surveillance officers with a narcotics team in the area of 4037 West Jackson Boulevard. Zogg, who was familiar with the neighborhood from having conducted "dozens and dozens of surveillances" in the area over the past 11 years, explained that the building at the given address was an abandoned two-flat. About 11 p.m., Zogg saw Palmer on the porch and steps area of the two-flat. Zogg was approximately 40 yards from Palmer, using 10 power binoculars. Although it was dark outside, a streetlight immediately in front of the two-flat provided light. Palmer was wearing a gray jacket, gray hoodie, blue jeans, and light green shoes.

¶ 5  Zogg testified that during his surveillance, three different men approached Palmer on separate occasions: a Hispanic man in a tan jacket, a black man in a black jacket, and a different black man in a black jacket. On each occasion, the customer gave United States currency to Palmer. Palmer would then place the money in his right jacket pocket, pull out a yellow strip of tape from his left jacket pocket, and tear off and tender to the customer items that had been attached to the strip. Zogg could not tell how much money Palmer received.

¶ 6  After the third transaction, Zogg radioed the enforcement officers on his team, broke surveillance, and approached Palmer and his third customer, who was later determined to be codefendant Hardiman. Palmer and Hardiman looked in Zogg's direction and fled into the two-flat. Just before Palmer entered the building, he dropped the yellow strip at the top of the steps. Zogg, who was about 10 yards behind Palmer at that point, picked up the yellow strip. He, Officer Rojas, and the enforcement officers then pursued Palmer inside the building. Rojas detained Palmer in the vestibule area and Zogg detained Hardiman in the rear of the building. Once Palmer was in custody, Rojas conducted a custodial search of his person in Zogg's presence. Rojas recovered $20 in multiple denominations from Palmer's right jacket

pocket. Zogg testified that the item he had recovered at the top of the steps consisted of two yellow strips holding 16 clear zip baggies, each with a "blue lady" design on them and each containing suspect heroin. Zogg brought the baggies to the police station, where they were inventoried, heat-sealed, and placed in a narcotics vault.

¶ 7    On cross-examination, Zogg testified that his surveillance of Palmer lasted less than 10 minutes, that he periodically radioed enforcement officers during the surveillance, and that less than five minutes passed between the time he broke surveillance and Palmer was detained. When asked how Palmer could have engaged in three narcotics transactions but only have $20 on him, Zogg explained that the recovered items were "nickel hit bags of heroin," meaning they sold for $5 each. He also explained that the cash recovered from Palmer was not inventoried because, pursuant to department policy, Palmer was allowed to retain the money.

¶ 8    Defense counsel then questioned Zogg about his surveillance location as follows:

"Q. *** You stated that you had observed my client for, approximately, ten minutes; and that you were 20 to 40 feet away?

A. No, I was about 40 yards away, Counsel.

Q. I'm sorry, 40 yards away?

A. Correct.

Q. And you had to use binoculars?

A. I do, correct.

Q. And were you elevated or on foot?

A. Street level.

Q. Were you in a vehicle or outside of a vehicle?

A. Outside of a vehicle.

Q. Were you in plain clothes or uniform?

A. Uniform, with cover clothing over the top of it, that being a camouflage jacket.

Q. Were you working alone or with a partner?

A. Surveillance officer was Rojas.

Q. And you said you were on the street level, correct?

A. That's correct."

¶ 9    Following this exchange, Zogg testified that he was not able to hear any conversation between Palmer and the men who approached him and could not see what denominations of bills the men gave Palmer. Zogg acknowledged that four people were inside the two-flat when the police entered, that the narcotics the police recovered were inventoried under four different numbers, and that only the set inventoried with the number ending "2929" was "assigned to" Palmer.

¶ 10    Zogg further testified on cross-examination that, during his surveillance, (i) he had a front view of Palmer, (ii) Officer Rojas was "in the rough vicinity" of his own surveillance location, and (iii) they were observing Palmer from the same direction. When defense counsel asked where exactly Zogg had been located, the prosecutor objected, arguing against disclosure due to officer safety. Defense counsel responded that concerns for officer safety did not apply, as Zogg had stated he was on street level, in uniform, and using a radio, which indicated this was not an undercover situation. The trial court had Zogg leave the room and

then addressed the attorneys regarding officer safety. The prosecutor answered that he believed the surveillance location "may be a spot that they still use," and suggested that the court have an *in camera* conversation with the officer on that topic. Defense counsel responded that based on Zogg's testimony that he was at street level and in uniform, the location could not be secret since "anybody in the neighborhood who walks by is going to see the cops."

¶ 11    The trial court decided to hold an "*in camera* review of the information" in the presence of the prosecutor and defense counsel. In chambers, the prosecutor questioned Zogg as follows:

> "Q. Officer, were you outside your—were you outside of your vehicle?
> A. That's correct.
> Q. And were you on the street?
> A. No.
> Q. Or were you in a building?
> A. Neither.
> Q. Where were you?
> A. At—there's a vacant property there, with ample vegetation.
> Q. I'm sorry, I didn't hear the—
> A. Vacant lot with a lot of vegetation."

¶ 12    At this point, the trial court stopped the questioning and went off record. When the court came back on record, it stated, "Based on the representation that it was a spot that they use continually, and revealing it will compromise officer safety—." Defense counsel interrupted, arguing that this was not a case involving the police using private property and thus compromising the safety of the property's owner. Defense counsel asserted that the exact surveillance location was relevant to cross-examination because it had to do with the view Zogg had of Palmer and Zogg's ability "to see what he says he saw" through the vegetation he was using to conceal himself. The prosecutor responded that Zogg had been clear that he was able to see over the vegetation with binoculars and had given "as many details as necessary." The trial court made the following decision:

> "All right. Considering the arguments of counsel, together with the elicited information as to the exact location, I do think you are able to elicit the issue you want to on cross-examination, without revealing the exact location. *** So, over the State's—I will permit you to ask questions that will not reveal the exact location. It will not be revealed; but certainly, you may challenge, based on the *in camera*, off-the-record questioning process, facts that address the issues you want to raise on cross-examination, okay?"

¶ 13    In open court, the trial court reiterated that its ruling was that the surveillance location would not be revealed, but defense counsel would be permitted to inquire as to other circumstances surrounding the location. Defense counsel then elicited from Zogg that in his surveillance location, he was kneeling and surrounded by bushes, grass, and weeds; that his head was above the shrubs; and that he held binoculars to his face. When counsel asked Zogg whether his view of Palmer was compromised by the bushes and grass, Zogg answered that his view was unobstructed. In response to defense counsel's question whether he used shrubs to conceal his location, Zogg gave the following answer:

"There's multiple things that go into camouflage and concealment, that being shadows, background. So, if I am sitting in the shadows, I have a dark background. I can keep some of myself, the portion I need to, that being my eyes, try to cover as much of myself as I can, I will have that portion; and I will normally try to have a good background. I'll try to blend in with it. And then, I'll have shadows around me, which helps conceal someone that's going past, from seeing me, because they are looking more in the darkness, whereas I'm looking into a more lighted area."

¶ 14 Following Zogg's testimony, the parties stipulated that a forensic chemist received inventory No. 12902929 in a heat-sealed condition, that the envelope contained 16 items of powder, and that she tested the contents of 7 of the 16 items. The 16 items weighed 2.7 grams, the 7 tested items weighed 1.2 grams, and the tested items were positive for the presence of heroin.

¶ 15 Palmer presented no evidence and the parties rested.

¶ 16 In closing, defense counsel questioned Officer Zogg's credibility. As relevant to this appeal, she argued that Zogg's claim that he observed Palmer engage in narcotics transactions did not "make very much sense, because he is saying that he can see *** he can't reveal his location, because he has to be hidden, but he can see everything perfectly, when it comes to my client." Counsel asserted that her cross-examination of Zogg was limited because the surveillance location was not revealed, but nevertheless maintained that Zogg's ability to observe Palmer was questionable because "there was vegetation in the way." The prosecutor responded by arguing that defense counsel's ability to cross-examine was not hampered or curtailed in any way and that Palmer's guilt had been proved beyond a reasonable doubt.

¶ 17 The trial court found Palmer guilty of possession of a controlled substance with intent to deliver.

¶ 18 Defense counsel filed a motion for a new trial, arguing, *inter alia*, that Palmer did not receive a fair and impartial trial, and Palmer filed a *pro se* "motion for re-trial due to ineffective assistance of counsel." The trial court conducted an inquiry into Palmer's claim of ineffectiveness and found it lacked merit. The court also denied defense counsel's motion for a new trial. The court later sentenced Palmer to six years in prison and Palmer timely appealed.

¶ 19 Palmer's first contention on appeal is that the trial court erred in applying the surveillance location privilege. He argues that the privilege should be rejected as a matter of law or, in the alternative, that the trial court should have required disclosure here because the State's case turned exclusively on Zogg's testimony. Palmer asserts that his constitutional right to effectively cross-examine Zogg was violated, that he was denied a fair trial, and that the error was not harmless.

¶ 20 As an initial matter, we note the State's argument that Palmer has forfeited this issue because he failed to raise it in his motion for a new trial. It is true that ordinarily, a defendant must both object at trial and include a claim in a posttrial motion in order to preserve it for appeal. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). However, an exception to forfeiture exists for constitutional issues that were not included in a posttrial motion, but were raised at trial and could be raised later in a postconviction petition. See *People v. Cregan*, 2014 IL 113600, ¶ 16; *People v. Flournoy*, 2016 IL App (1st) 142356, ¶ 23. In such cases, "the interests in judicial economy favor addressing the issue on direct appeal rather than requiring

defendant to raise it in a separate postconviction petition." *Cregan*, 2014 IL 113600, ¶ 18. Here, Palmer's arguments regarding the surveillance location privilege implicate his constitutional right to confront witnesses against him. *Flournoy*, 2016 IL App (1st) 142356, ¶ 23. Accordingly, we will review his claims. *Id.*

¶ 21    Palmer's first argument is that the surveillance location privilege should be rejected entirely as a matter of law for three reasons: (1) though the creation of a privilege is presumptively a legislative task, the surveillance location privilege was created by this court rather than by the Illinois legislature; (2) the privilege has not been addressed by the Illinois Supreme Court; and (3) the privilege does not meet a test for recognizing evidentiary privileges that was set forth by the Illinois Supreme Court in *People ex rel. Birkett v. City of Chicago*, 184 Ill. 2d 521 (1998).

¶ 22    We decline Palmer's invitation to completely abandon the surveillance location privilege. This court has developed a consistent and long-standing body of law regarding the privilege. It was first recognized in Illinois in *People v. Criss*, 294 Ill. App. 3d 276 (1998), and evolved from the informant's privilege, which is codified in the Illinois Compiled Statutes. See 735 ILCS 5/8-802.3 (West 2012); *Criss*, 294 Ill. App. 3d at 280. Since *Criss*, the surveillance location privilege has been recognized and applied in numerous cases in our state. See, *e.g.*, *In re Manuel M.*, 2017 IL App (1st) 162381, ¶ 18; *Flournoy*, 2016 IL App (1st) 142356, ¶ 26; *People v. Reed*, 2013 IL App (1st) 113465, ¶ 18; *People v. Britton*, 2012 IL App (1st) 102322, ¶ 26; *People v. Price*, 404 Ill. App. 3d 324, 330-31 (2010); *People v. Stokes*, 392 Ill. App. 3d 335, 340 (2009); *People v. Bell*, 373 Ill. App. 3d 811, 818 (2007); *People v. Quinn*, 332 Ill. App. 3d 40, 43 (2002); *People v. Knight*, 323 Ill. App. 3d 1117, 1127-28 (2001).

¶ 23    Moreover, *Birkett* and *Criss* were both decided in 1998. Despite the plethora of cases recognizing the qualified surveillance privilege that have been decided by our court over the past decades, our supreme court has not cast doubt on the continuing viability of this body of law. And as the surveillance location privilege derives from the legislatively enacted informant's privilege and implicates the same policy concerns, we deem it ill-advised to eliminate it entirely.

¶ 24    Palmer next challenges the state's invocation of the privilege under the circumstances of this case, stressing that his conviction rested entirely on Zogg's uncorroborated testimony.

¶ 25    Criminal defendants have a constitutional right to confront witnesses against them, which includes the right to cross-examination. See U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Crawford v. Washington*, 541 U.S. 36, 54 (2004). Yet, the right to cross-examination is not absolute. *Price*, 404 Ill. App. 3d at 330. A trial court is afforded broad discretion to limit the scope of cross-examination, and its restriction of cross-examination will not be reversed absent an abuse of that discretion. *Id.*

¶ 26    As discussed above, Illinois courts recognize a qualified privilege regarding the disclosure of surveillance locations. See, *e.g.*, *Manuel M.*, 2017 IL App (1st) 162381, ¶ 18. Whether disclosure is required is determined on a case-by-case basis, with the trial court balancing the public interest in keeping the location secret against the defendant's interest in preparing a defense and right to test the credibility of a witness by cross-examination. *Id.*; *Flournoy*, 2016 IL App (1st) 142356, ¶ 34. The more important a witness is to the State's case, the more important the defendant's right to cross-examination concerning the surveillance location becomes. *Flournoy*, 2016 IL App (1st) 142356, ¶ 34. If there is no question about a surveillance officer's ability to observe or evidence of the crime in question

appears on a contemporaneous video recording, disclosure would not be required. *Id.* In contrast, if the prosecution's case depends almost exclusively on one police officer's testimony, disclosure must " 'almost always' " be required. *Id.* (quoting *Knight*, 323 Ill. App. 3d at 1128).

¶ 27    Where, as here, the State invokes the surveillance location privilege at trial, it bears the initial burden of proof in demonstrating that the privilege should apply. *Manuel M.*, 2017 IL App (1st) 162381, ¶ 19. The State carries this burden by presenting evidence that the surveillance location was either (1) on private property with the permission of the owner or (2) in a useful location, the utility of which would be compromised by disclosure. *Id.* To evaluate whether the privilege applies, the trial court should hold an *in camera* hearing, outside the presence of the defendant and defense counsel, during which the State's witness must reveal the surveillance location and make a preliminary showing that disclosure of that location would harm the public interest. *Flournoy*, 2016 IL App (1st) 142356, ¶ 35; but see *Manuel M.*, 2017 IL App (1st) 162381, ¶ 26 (holding that the *in camera* examination of the officer should be conducted outside the presence of the State and the defense, that it should be strictly limited to disclosure of the exact surveillance location, and that any testimony or argument addressing the public interest in nondisclosure should be made in open court). Then, the trial court should weigh the defendant's need for the surveillance location against the public's interest in nondisclosure. *Flournoy*, 2016 IL App (1st) 142356, ¶ 35. Factors to be considered in evaluating the public interest in nondisclosure include the crime charged, the possible defenses, and the potential significance of the privileged information. *Id.*

¶ 28    If the State satisfies its burden of proof at the *in camera* hearing, then the burden shifts to the defendant to overcome the privilege. *Id.* ¶ 36. The defendant's burden at this point varies depending on the timing of the invocation of the privilege. *Id.* If the surveillance location privilege was invoked or challenged pretrial, the defendant may overcome it by making a strong showing that the disclosure of the surveillance location is material or necessary to the defense and that his need for the information outweighs the public's interest in keeping the location secret. *Id.* In contrast, if the State first invokes the privilege at trial, as it did in the instant case, then the defendant need only show that the surveillance location is relevant and helpful to his defense, or is essential to the fair determination of the cause. *Id.*

¶ 29    Here, the State's invocation of the privilege at trial triggered an *in camera* hearing. The portion of that hearing that was transcribed reveals that the trial court allowed the State to question Zogg and elicit information that his surveillance location was in a vacant property with "a lot of vegetation." Transcription then stopped. When it resumed, the court indicated that Zogg had represented that the location was a spot the police used continually and that revealing it would compromise officer safety. Defense counsel argued that the exact surveillance location was necessary in order to cross-examine Zogg regarding his ability "to see what he says he saw" through the vegetation he was using to conceal himself. The trial court ruled that the surveillance location would not be revealed, stating to defense counsel, "I do think you are able to elicit the issue you want to on cross-examination, without revealing the exact location." The court also stated that defense counsel would be "permitted to inquire as to other circumstances surrounding the location."

¶ 30    We find that, although the trial court was sensitive to Palmer's need to ascertain Zogg's exact surveillance location, it failed to take into account other factors such as (i) the lower burden Palmer was required to meet to obtain disclosure, (ii) Zogg's status as the State's only

live witness, and (iii) the fact that surveillance was conducted from a vacant lot, which does not implicate the safety of cooperating landowners.

¶ 31    First, as noted, when the surveillance location privilege is invoked at trial, the defendant, in order to overcome the privilege, is only required to show that the exact location is relevant and helpful to his defense. *Manuel M.*, 2017 IL App (1st) 162381, ¶ 19; *Flournoy*, 2016 IL App (1st) 142356, ¶ 36. Particularly since Zogg testified that his body was completely concealed by vegetation, but that he was still able to see Palmer's actions, the disclosure of the area in the vacant lot where Zogg positioned himself would have enabled defense counsel to challenge that testimony more effectively. Thus, this information was relevant and helpful to Palmer's defense.

¶ 32    Second, it has long been the position of this court that when the State's case depends almost exclusively on one police officer's testimony, disclosure must "almost always" be ordered. See, *e.g.*, *Manuel M.*, 2017 IL App (1st) 162381, ¶ 22; *Flournoy*, 2016 IL App (1st) 142356, ¶ 34; *Reed*, 2013 IL App (1st) 113465, ¶ 18; *Price*, 404 Ill. App. 3d at 331; *Stokes*, 392 Ill. App. 3d at 340; *Knight*, 323 Ill. App. 3d at 1128. Here, the State's case against Palmer rested almost entirely upon Zogg's testimony, the State's sole live witness. Defense counsel's trial strategy was to challenge Zogg's credibility via cross-examination—the principal means to test a witness's credibility. *Manuel M.*, 2017 IL App (1st) 162381, ¶ 22. Because Zogg's testimony provided the only evidence that Palmer had engaged in three hand-to-hand narcotics transactions in front of the two-flat, Zogg's ability to see the porch and steps of that two-flat from his point of observation was highly relevant to the credibility of his testimony, and disclosure of the location would have been helpful to the defense. We agree with Palmer that asking a witness if his sight line was clear is pointless if the witness's answer cannot then be tested by specific questions based on his exact location. By blocking disclosure of the surveillance location, the trial court seriously hampered Palmer's ability to test the credibility of the only witness against him.

¶ 33    Third and finally, the circumstances here, involving an officer concealing himself behind vegetation in a vacant lot, do not implicate the safety concerns of property owners who allow police to conduct surveillance from private property. See *Criss*, 294 Ill. App. 3d at 280-81. And while officer safety is also a concern underlying the surveillance location privilege, we perceive no greater threat to officer safety as a result of disclosure in this case given that anyone selling drugs in the vicinity of 4037 West Jackson Boulevard now knows that officers conceal themselves behind vegetation in vacant lots nearby.

¶ 34    Accordingly, we conclude that the trial court abused its discretion when it applied the surveillance location privilege in this case. See *Manuel M.*, 2017 IL App (1st) 162381, ¶¶ 21-22 (where the State's case rested entirely upon one officer's testimony, the trial court abused its discretion in applying the surveillance location privilege and only permitting defense counsel to inquire into " 'distance, lighting, [and] everything else' "); *Flournoy*, 2016 IL App (1st) 142356, ¶¶ 4, 49 (disclosure was warranted where the officer's testimony concerning what he saw from his surveillance location was the linchpin of the State's case, and the trial court's allowance that defense could "cross as to the distance whether any possible obstructions, any visual aids" was insufficient); *Price*, 404 Ill. App. 3d at 333 (the trial court abused its discretion where it invoked the privilege without conducting a balancing inquiry and the defendant's conviction rested solely on one officer's testimony); *Knight*, 323 Ill. App. 3d at 1121 (where the case turned almost exclusively on one officer's

uncorroborated testimony, the trial court abused its discretion in allowing cross-examination regarding " 'his distance, the lighting, opportunity to observe, obstructions blocking his view, and things of that nature without requiring the officer to disclose the exact location of this surveillance' "); but see *Bell*, 373 Ill. App. 3d at 818-19 (finding no abuse of discretion where defense counsel cross-examined the officer extensively with respect to lighting conditions, any possible obstructions, the officer's familiarity with the area, his use of binoculars, whether he was in uniform, and the distance of the nearest individual to the defendant); *Quinn*, 332 Ill. App. 3d at 44 (finding no abuse of discretion where defense counsel cross-examined the officer with respect to lighting conditions, any possible obstructions, and use of binoculars).

¶ 35    The failure to disclose Zogg's location—so that Palmer could test his claim that the vegetation that concealed Zogg's presence in a vacant lot did not also impair his ability to observe Palmer's conduct—denied Palmer a fair trial. Thus, we reverse Palmer's conviction and remand for a new trial, during which the State must disclose Zogg's surveillance location. We find no double jeopardy bar to retrial, as the evidence supports a guilty finding on the charged offense. See *People v. Olivera*, 164 Ill. 2d 382, 393 (1995).

¶ 36    Given our disposition, we need not address Palmer's contention regarding the accuracy of the mittimus.

¶ 37    Reversed and remanded.