2022 IL App (1st) 210173-U

FIFTH DIVISION
August 5, 2022

No. 1-21-0173

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of Cook County. |
| | ) | |
| v. | ) | 09 CR 5917 |
| | ) | |
| KENDRICK PEARSON, | ) | Honorable Lawrence E. Flood, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE CONNORS delivered the judgment of the court.
Presiding Justice Delort and Justice Hoffman concurred in the judgment.

**ORDER**

*Held:* Trial court properly dismissed defendant's second-stage postconviction petition where defendant did not make a substantial showing that his trial counsel or appellate counsel was ineffective.

¶ 1     This appeal is taken from the circuit court's grant of the State's motion to dismiss defendant Kendrick Pearson's amended second-stage postconviction petition. Pearson contends that the petition made a substantial showing that his trial counsel and his appellate counsel were constitutionally ineffective, and that he was entitled to a third-stage evidentiary hearing. The State responds that Pearson's petition did not make a substantial showing that either his trial

counsel or his appellate counsel was constitutionally ineffective, and the circuit court correctly granted its motion to dismiss. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3       Pearson's conviction arose from events that occurred on July 9, 2009. At a bench trial, Chicago police officer Wrigley testified that at about 8:30 p.m., he and other officers set up narcotics surveillance in the vicinity of 3553 West 13th Place, where Pearson and another man were standing on the sidewalk. As Officer Wrigley watched, a person approached Pearson and engaged him in a brief conversation. The person gave Pearson money, whereupon Pearson took a clear plastic bag from his jacket pocket, retrieved an item from the bag, and gave the item to the person. Based upon Officer Wrigley's training and experience, he believed a narcotics transaction had occurred.

¶ 4       Officer Wrigley testified that after the buyer walked away, Pearson and the other man got into a silver car and drove off. Within two minutes, they returned in the same car and parked. Pearson resumed his position on the sidewalk, near a white car with its trunk open. The other man walked to the corner and yelled, "rocks," a street term for crack cocaine, three or four times at passing cars. A third man appeared to be working on the white car's front tire.

¶ 5       A short time later, two men approached Pearson, who moved into the middle of the street to meet them. Pearson accepted money from both men, took a clear plastic bag from his jacket pocket, retrieved small items from the bag, and gave one to each man before they walked away. At this point, Officer Wrigley radioed enforcement officers with the description of Pearson and the man yelling "rocks." As the enforcement officers approached, Pearson walked around the back of the white car and stopped near the passenger's side of the trunk. Officer Wrigley's view of Pearson was partially obstructed by the open trunk. The enforcement officers placed Pearson

2

into custody. At the police station, a custodial search of Pearson was conducted and $225 was recovered from his pants pocket.

¶ 6    Chicago police officer Todd Olsen testified that on the night in question, he was working as an enforcement officer. At about 8:30 p.m., he received instructions to detain a person matching Pearson's description who was standing near a white car with an open trunk at 13th Place and Central Park Avenue. As Officer Olsen and his partner approached, Olsen saw Pearson step off the sidewalk to the rear of the white car. Pearson reached into his right jacket pocket, removed a clear plastic bag, and tossed it into the open trunk. After Pearson was detained, Officer Olsen walked back to the open trunk. He could see a clear plastic bag containing several bags of crack cocaine.

¶ 7    The parties stipulated that the five recovered items weighed 0.7 grams total, and that the one item that was tested weighed 0.1 grams and tested positive for the presence of cocaine.

¶ 8    Pearson testified that at about 8:30 p.m. on the night in question, he went to the corner of 13th Place and Central Park Avenue to meet two friends and go out to shoot pool. As he waited on the sidewalk for one of the friends to come down, he noticed a man installing speakers in the open trunk of a white car. Pearson joined a group of five or six men who walked over to the car to watch the man hook up the speaker wires. A few minutes later, police officers arrived, got out of their car, and detained all five or six men at the scene.

¶ 9    Pearson denied possessing drugs, selling drugs, or throwing anything in the trunk of the white car. He also denied that anyone was yelling "rocks" at the corner. Pearson testified that he had $245 on his person to pay his fiancée's light bill. He acknowledged that he had been convicted of robbery and aggravated battery in 2000.

¶ 10    The trial court found Pearson guilty of possession of a controlled substance with intent to deliver. He was sentenced to eight years in prison.

¶ 11    On direct appeal, Pearson contended that the evidence was insufficient to convict and challenged the imposition of a three year term of mandatory supervised release (MSR). We affirmed Pearson's conviction and sentence. *People v. Pearson*, No. 1-09-2842 (2011) (unpublished order under Supreme Court Rule 23).

¶ 12    On October 13, 2009, while his direct appeal was pending, Pearson filed a *pro se* petition and an amended *pro se* petition for postconviction relief. In these pleadings, Pearson contended that his trial counsel was ineffective for failing to challenge his warrantless arrest for lack of probable cause; that the trial court erred in enhancing his sentence based on his criminal background; that intent to deliver was not proved; that his sentence was excessive; and that the trial court erred in not appointing new counsel to represent Pearson on his posttrial motions. The trial court docketed Pearson's petition and advanced it to second-stage proceedings.

¶ 13    The Cook County Public Defender was appointed to represent Pearson. On December 6, 2010, Pearson filed a motion for new postconviction counsel, and on March 30, 2011, Pearson filed another *pro se* petition for postconviction relief. In his petition, Pearson asserted that he had not been contacted by postconviction counsel since July 21, 2010; that although the trial court had found no probable cause and dismissed the charges against him, the State's Attorney improperly obtained a grand jury indictment; that appellate counsel was ineffective for failing to raise the issue that trial counsel was ineffective for failing to inform defendant that the ARDC had previously suspended him from the practice of law, failing to file pretrial motions to quash arrest and suppress evidence, failing to move to dismiss the indictment, and failing to request a new trial and sentence reduction; that the trial court should have appointed new counsel prior to

sentencing; that intent to deliver was not proved at trial; and that his MSR term must be reduced to two years.

¶ 14    On May 11, 2011, the Assistant Public Defender who had been appointed to represent Pearson filed a motion to withdraw as postconviction counsel based on a conflict of interest. The trial court granted the motion. The next attorney appointed also filed a motion to withdraw citing a conflict of interest. A third attorney was appointed.

¶ 15    On November 1, 2011, counsel filed an Illinois Supreme Court Rule 651(c) (eff. Jul. 1, 2017) certificate and a "Supplemental Petition for Post-Conviction Relief." The supplemental petition indicated that it was meant to add Pearson's *pro se* claims. A second supplemental petition for postconviction relief was filed on November 15, 2012, again stating that the purpose was to add Pearson's *pro se* claims. On December 6, 2012, upon motion of the State, the trial court entered an order directing postconviction counsel to file an amended petition presenting only those claims that counsel believed had merit.

¶ 16    On December 12, 2012, counsel filed a new Rule 651(c) certificate and an amended petition for postconviction relief. Five claims were presented including that trial counsel was ineffective for failing to obtain available evidence from the Police Observation Device (POD)/surveillance camera in the area and appellate counsel was ineffective. The State filed a motion to dismiss, that the trial court granted, finding that Pearson's claims were speculative, not based on any evidence found in the record or supporting documents, or barred under *res judicata* and/or waiver. With regards to claims of ineffective assistance of counsel, the court found that Pearson failed to set forth facts to support the allegations.

¶ 17    On appeal from the dismissal of his postconviction petition, Pearson contended that postconviction counsel provided unreasonable assistance under Supreme Court Rule 651(c). This

court found that Pearson overcame the presumption that postconviction counsel complied with Rule 651(c) in connection with the claims concerning grand jury transcripts and POD video footage. We reversed the judgment of the circuit court and remanded the cause for second-stage proceedings. We stated that on remand, counsel should be given the opportunity to supplement the amended postconviction petition with grand jury transcripts and POD video footage. *People v. Pearson*, 2016 IL App (1st) 140017-U, ¶ 33.

¶ 18    Following remand, Pearson's counsel issued subpoenas to obtain any available video footage that the police or Office of Emergency Management Communications had obtained on the date in question. On January 29, 2020, counsel filed a new Rule 651(c) certificate and amended postconviction petition, and included the same supporting documents. The new supporting exhibits included: (1) a response from the OEMC stating that the cameras were past retention and had been written over, and that there was no previously saved video from the requested location/date; (2) a response from the police department stating there were no in car camera records from the date in question; and (3) a copy of Officer Wrigley's grand jury testimony.

¶ 19    Pearson's second-amended postconviction petition alleged ineffective assistance of trial counsel for failing to investigate the crime scene and obtain evidence, and for failing to obtain Officer Wrigley's surveillance location which would have enabled trial counsel to impeach Officer Wrigley's testimony. Pearson also alleged ineffective assistance of appellate counsel for failing to raise trial counsel's ineffectiveness.

¶ 20    The State filed a renewed motion to dismiss, arguing that Pearson's allegations were speculative, conclusory, and not based on any evidence in the record.

¶ 21    On October 8, 2020, the trial court heard argument on the renewed motion to dismiss and took the matter under advisement. On January 4, 2021, the trial court read its ruling into the record and noted that it would "stand on" its original ruling, granting the motion to dismiss. It stated that argument about camera footage was speculative. It also stated that grand jury testimony has limited value and its use for impeachment was more a matter of trial strategy.

¶ 22    Pearson now appeals the second-stage dismissal of his second-amended postconviction petition.

¶ 23                                II. ANALYSIS

¶ 24    On appeal, Pearson contends that his petition made a substantial showing that his appellate and trial counsel failed to provide constitutionally effective assistance. The State maintains that the trial court properly dismissed the amended second-stage postconviction petition because it, and its supporting documentation, did not make a substantial showing that his trial or appellate counsel denied him effective assistance of counsel. We agree with the State.

¶ 25    The Post-Conviction Hearing Act (Act) provides a three-stage process for an imprisoned person to raise a constitutional challenge to a conviction or sentence. 725 ILCS 5/122-1 *et seq*. (West 2020); *People v. Hatter*, 2021 IL 125981, ¶ 22. If the petition is not dismissed at the first stage as frivolous or patently without merit, it advances to the second stage. 725 ILCS 5/122-5 (West 2020). Here, the trial court stated that it advanced Pearson's petition to the second stage because his multiple *pro se* filings caused the court to "inadvertently" go past the 90-day summary review period. See *Pearson*, 2016 IL App (1st) 140017-U, ¶ 15.

¶ 26    At the second stage, the State may either answer the petition or move to dismiss it. *People v. Domagala*, 2013 IL 113688, ¶ 33. If the State moves to dismiss the petition, the circuit court must decide whether to grant the State's motion or advance the petition to the third stage

for an evidentiary hearing. *People v. Edwards*, 197 Ill. 2d 239, 246 (2001). A petitioner is only entitled to an evidentiary hearing when the allegations in the petition supported by "affidavits, records, or other evidence" (725 ILCS 5/122-2 (West 2020)) make a substantial showing of a deprivation of rights under either the United States or Illinois Constitutions or both (*People v. Pitsonbarger*, 205 Ill. 2d 444, 455 (2002)).

¶ 27     At the second stage, "[t]he inquiry into whether a post-conviction petition contains sufficient allegations of constitutional deprivations does not require the circuit court to engage in any fact-finding or credibility determinations." *People v. Coleman*, 183 Ill. 2d 366, 385 (1998). The Act contemplates that such determinations will be made at the evidentiary stage, not the dismissal stage. *Id.* The circuit court examines a postconviction petition to determine its legal sufficiency and any allegations not affirmatively refuted by the record must be taken as true. *Domagala*, 2013 IL 113688, ¶ 37. Therefore, the substantial showing of a constitutional violation that must be made at the second stage is a "measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, which if proven at an evidentiary hearing, would entitle petitioner to relief." *Id.* Where, as here, the circuit court dismisses a defendant's postconviction petition at the second stage after finding no substantial showing of a constitutional violation, review of the dismissal is *de novo*. *People v. Cotto*, 2016 IL 119006, ¶ 24.

¶ 28     In this case, the circuit court dismissed the second-amended postconviction petition, finding that Pearson failed to make a substantial showing of ineffective assistance of trial or appellate counsel. Claims of ineffective assistance of counsel are analyzed under the two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504 (1984). Under this standard, a defendant

8

must show that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688.

¶ 29   To satisfy the deficient performance prong of *Strickland*, a defendant must show that counsel's performance was so inadequate "that counsel was not functioning as the 'counsel' guaranteed by the sixth amendment" and, also, must overcome the strong presumption that any challenged action or inaction may have been the product of sound trial strategy. *People v. Evans*, 186 Ill. 2d 83, 93 (1999); *People v. Griffin*, 178 Ill. 2d 65, 73-74 (1997). Matters of trial strategy are generally immune from claims of ineffective assistance of counsel. *People v. Smith*, 195 Ill. 2d 179, 188 (2000). In addition, even when a defendant can show deficient performance, the second prong requires the defendant to show that he was prejudiced as a result. *Id.* A defendant must show that counsel's deficiency was so serious that it deprived him of a fair trial. *Id.*

¶ 30   Pearson contends that he made a substantial showing that his trial counsel was ineffective for failing to elicit Officer Wrigley's exact surveillance location and for failing to investigate the crime scene. "A defendant has a fundamental right to confront witnesses against him, but the trial court may limit the scope of cross-examination." *People v. Quinn*, 332 Ill. App. 3d 40, 43 (2002). The right to cross-examine is not absolute and is satisfied when "the defendant is permitted to expose the fact finder to facts from which it can assess [the] credibility and reliability of the witness." *Id.*

¶ 31   The State has the benefit of a qualified privilege regarding disclosure of secret surveillance locations. *Id.* This court has recognized a qualified privilege from disclosing secret surveillance locations in a criminal proceeding. *In re Manuel M.*, 2017 IL App (1st) 162381, ¶ 18; *People v. Palmer*, 2017 IL App (1st) 151253, ¶ 22. Courts decide the need for disclosure of

surveillance location on a case-by-case basis, balancing the public interest in preserving and maintaining the secrecy of the surveillance location with a defendant's need of disclosure of the surveillance location to prepare a defense. *People v. Reed*, 2013 IL App (1st) 113456, ¶ 18. Trial courts should endeavor to protect "public interest in keeping the exact surveillance location secret" but also take steps necessary "to ensure accurate fact finding." *Quinn*, 332 Ill. App. 3d at 43. Factors relevant in the trial court's analysis regarding the public interest in nondisclosure are "the crime charged, the possible defenses, and the potential significance of the privileged information." *Id.* The disclosure of a surveillance point will be compelled if the information is material to the issue of guilt. *Id.* at 44 (citing *People v. Knight*, 323 Ill. App. 3d 1117, 1126-27 (2001)).

¶ 32    Here, during direct examination, the following colloquy occurred between the State and Officer Wrigley:

"Q:      Now Officer, without disclosing your point of surveillance, how far were you from the Defendant when you were making all of your observations about him?

A:       Generally I believe I was approximately 150 feet away from the Defendant.

Q:       What were the lighting conditions like?

A:       It was dark outside but there's good artificial lighting along Central Park and also the intersection of 13th.

Q:       Was anything blocking your view of the Defendant during your surveillance?

A:     Not during my surveillance. As the enforcement officers approached [Pearson] made his way around the white vehicle I referred to parked and I was partially – my complete view of him was partially blocked at that point in time.

Q:     During the surveillance when you observed the suspect narcotics transactions your view was unimpeded?

A:     That's correct."

¶ 33    On cross-examination, defense counsel elicited Officer Wrigley's testimony that during his surveillance he was positioned "a little north of 13th" Place. Counsel asked which direction Pearson was facing when the third person approached him to have a conversation. Officer Wrigley testified that Pearson "was on the sidewalk facing northbound." The following colloquy then took place:

"Q:     Okay. And what part of [Pearson's] body was closest to you?

A:     I would say at that point left side.

Q:     Left, to the left of where [Pearson] was when he was facing north would be to the west, correct? You were south and west of [Pearson]when you're making this observation?

A:     That's correct.

Q:     There is a large vacant lot at the southeast corner of 13th Place and Central Park?

A:     Southeast.

Q:     Southeast corner.

A:     Yes, there is.

11

Q:      You were not in that vacant lot, were you?

[STATE]:      Objection.

THE COURT:      Sustained.

Q:      There's no obstructions or obstacles there, there's no parked cars or trees, anything in that vacant lot for you to hide there?"

[STATE]: Objection.

THE COURT: I'll let him answer that. He can answer that.

A:      At the time I was doing the surveillance your question is?

Q:      Your surveillance position was not in the lot?

[STATE]: Objection.

THE COURT:      I'll let him answer. Overruled.

A:      That's correct.

¶ 34      Counsel asked Officer Wrigley if he could see what was in the plastic bag that Pearson had in his right shirt pocket. Officer Wrigley responded that he could not see what was in the bag. Counsel asked him if the left side of Pearson's body was closest to where Officer Wrigley was making observations, to which Officer Wrigley stated it was and that Pearson was "pivoting away" and it "appeared as though he reached into his right pocket."

¶ 35      Defense counsel asked Officer Wrigley if he saw Pearson drop something into the trunk of the white vehicle or reach into his right pocket to take something out as enforcement officers were arrive. Officer Wrigley responded that he had not seen those things happen. Counsel asked Officer Wrigley if he was watching with binoculars, to which Officer Wrigley responded that he used them at different times during the surveillance. He further testified that when he saw Pearson walk behind the white car, as enforcement officers approached, his view of Pearson was

"partially obstructed" by the vehicle so that he could only see Pearson's head and shoulders. Defense counsel concluded his cross-examination by confirming that Officer Wrigley was south and west of the vehicle and about 150 feet away.

¶ 36 Based on this testimony, we find that the record shows that defense counsel sufficiently cross-examined Officer Wrigley about his surveillance location so that the trial court could assess his credibility and reliability without pinpointing the officer's exact location. See *Quinn*, 332 Ill. App. 3d at 44 (cross-examination about surveillance sufficient although officer did not pinpoint exact location).

¶ 37 In *Quinn*, the trial court found the defendant guilty of possession of a controlled substance with intent to deliver within 1000 feet of a church. *Id.* at 43-44. At trial, the officer testified that he used his binoculars to observe the defendant, from a distance of 75-100 feet, conduct four narcotics transactions at a location within 613 feet of a church. *Id.* at 42. The officer then radioed information to enforcement officers, while remaining in his surveillance location to watch the defendant's arrest and to direct an officer to where he had seen the defendant remove the narcotics. *Id.*

¶ 38 On cross-examination, the officer answered a series of questions about his surveillance which established that he was on foot, in uniform, south of Chicago Avenue, in the 700 block on the east side of the street – the same side of the street as a vacant lot shown in one of the photographs. *Id.* The trial court sustained the State's objections asking if the officer was in a building, in the vacant lot, or south of the vacant lot. *Id.* at 42-43.

¶ 39 On appeal in *Quinn*, the defendant argued that his confrontation rights were violated by the trial court's limitations on his cross-examination of the surveillance officer. *Id.* at 43. This court disagreed, stating:

"Defendant was allowed to cross-examine Officer Betancourt extensively with respect to his surveillance, lighting conditions, and any possible obstructions. Without pinpointing the exact surveillance location, defendant was permitted to establish the officer's credibility and reliability. In addition, defendant was also allowed to elicit that Officer Betancourt did not include in his police report or grand jury testimony the fact that he had used binoculars, a relevant area of impeachment. We conclude that the trial court properly granted the State a qualified privilege regarding the disclosure of the exact surveillance location of Officer Betancourt." [Citations omitted]. *Quinn*, 332 Ill. App. 3d at 44.

¶ 40    Similarly here, defense counsel was permitted to question Officer Wrigley extensively about the lighting, what he saw, how far away from the transactions he was, and whether he used binoculars. Defense counsel elicited from Officer Wrigley that he was positioned 150 feet away from Pearson, a little north of 13th Place. Pearson was on the sidewalk facing northbound, with his left side of his body closest to Officer Wrigley. Defense counsel elicited that Officer Wrigley was south and west of Pearson when he was making his observations, and that that he was not in the vacant lot that is located on the southeast corner of 13th Place and Central Park. Accordingly, without pinpointing the exact surveillance location, defense counsel was permitted to establish Officer Wrigley's credibility and reliability. We find no ineffective assistance of counsel.

¶ 41    Pearson maintains, relying on *Knight*, that defense counsel was ineffective for failing to pinpoint Officer Wrigley's exact location. In *Knight*, the court found prejudicial error when the application of the privilege of nondisclosure severely hampered the defendant's ability to cross-examine the surveillance officer to cast doubt on his testimony. *Knight*, 323 Ill. App. 3d at 1128. However, in *Knight*, the identity of the offender was contested, and the police officer, who was

not using binoculars, admitted that he and his partner lost sight of the alleged offender for one to two minutes as they drove from the surveillance point. *Id*. at 1120.

¶ 42    Unlike the circumstances in *Knight*, identity was not at issue in this case. Officer Wrigley radioed a detailed description of Pearson, and remained in radio contact with the enforcement officers until Pearson was arrested and the narcotics were recovered. Officer Olsen corroborated that testimony. Moreover, defense counsel was allowed to extensively cross-examine Officer Wrigley and pinpoint his surveillance location sufficiently enough to allow the trial court to evaluate his testimony without revealing the exact surveillance location. See *Quinn*, 332 Ill. App. 3d at 45. Considering the public's interest in keeping the surveillance location a secret and the relative insignificance of the exact point of surveillance in light of the specificity revealed on cross-examination, we conclude that defense counsel's performance was not deficient for failing to elicit the exact location of Officer Wrigley. Having found that defense counsel's performance was not deficient, we therefore conclude Pearson did not receive ineffective assistance of counsel. *Evans*, 186 Ill. 2d at 93 (to satisfy the deficient performance prong of *Strickland*, a defendant must show that counsel's performance was so inadequate "that counsel was not functioning as the 'counsel' guaranteed by the sixth amendment").

¶ 43    Pearson also contends that his trial counsel was ineffective for failing to investigate the scene. Specifically, Pearson claims "Officer Olsen testified that the area was well lit because it was at the end of an alley and alleys are generally well lit," but that postconviction evidence "shows that the alley was not well-lit because it did not have any streetlamps." These allegations are entirely devoid of citations to the record, and therefore have been forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (argument shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on); *Obert v.*

15

*Saville*, 253 Ill. App. 3d 677, 682 (1993) (a reviewing court is entitled to have issues clearly defined with pertinent authority cited, and if an appellant does not do so, the contentions are forfeited).

¶ 44   Moreover, a review of the record shows that Officer Wrigley testified that while it was dark outside, there was good artificial lighting along Central Park and the intersection of 13th Place. There was no discussion of streetlamps in an alleyway. Accordingly, we find that trial counsel's performance was not deficient and that he did not fail to conduct a reasonable investigation at the scene, and therefore Pearson's claim of ineffective assistance of counsel was without merit.

¶ 45   Finally, we address Pearson's claim of ineffective assistance of appellate counsel. Pearson contends that appellate counsel was ineffective for failing to raise the issue of trial counsel's ineffectiveness. The two-pronged *Strickland* standard applies equally to claims of ineffective assistance of appellate counsel. *People v. Golden*, 229 Ill. 2d 277, 283 (2008). "A defendant who contends that appellate counsel rendered ineffective assistance, *e.g*., by failing to argue an issue, must show that the failure to raise that issue was objectively unreasonable and that but for this failure, defendant's conviction or sentence would have been reversed." *People v. Griffin*, 178 Ill. 2d 6, 74 (1997). If the underlying issue is nonmeritorious, the defendant has suffered no prejudice. *People v. Rogers*, 197 Ill. 2d 216, 222 (2001). Accordingly, because we found Pearson's claim of ineffective assistance of trial counsel to be nonmeritorious, it necessarily follows that appellate counsel was not ineffective for failing to raise the issue of trial counsel's ineffectiveness on appeal.

¶ 46                                    III. CONCLUSION

¶ 47   For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 48    Affirmed.